2018 PA Super 260

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
|---|---|---|
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| TRAVIS WADE MATTHEWS | : | |
| | : | |
| Appellant | : | No. 2001 MDA 2017 |

Appeal from the Judgment of Sentence December 4, 2017
In the Court of Common Pleas of Luzerne County Criminal Division at
No(s): CP-40-CR-0000656-2017

BEFORE:   SHOGAN, J., STABILE, J., and STEVENS*, P.J.E.

OPINION BY STEVENS, P.J.E.:                **FILED SEPTEMBER 20, 2018**

Appellant, Travis Wade Matthews, appeals from the judgment of sentence entered in the Court of Common Pleas of Luzerne County following his conviction by a jury on one count of robbery, two counts of conspiracy, one count of theft by unlawful taking, and one count of simple assault.[1] After a careful review, we affirm.

The relevant facts and procedural history are as follows: Appellant was arrested in connection with the robbery of a Domino's pizza delivery driver in Pittston, Pennsylvania.  Represented by counsel, he proceeded to a jury trial on October 30, 2017.

At the trial, the delivery driver, Bruce Eckersley, testified that, on January 5, 2017, he was working during the night shift when the pizza store

_____

[1] 18 Pa.C.S.A. §§ 3701(a)(1)(ii), 903, 3921(a), and 2701(a)(3), respectively.

_____

*   Former Justice specially assigned to the Superior Court.

received a call at 10:23 p.m. for a delivery of two pizzas to a house on Elizabeth Street in Pittston. N.T., 10/30/17, at 32. Mr. Eckersley left the store with the two pizzas in a "heat bag" to keep them warm and noticed that it was a cash order. *Id.* at 37-38. The heat bag had a driver tag stuck on it indicating the delivery address, total, and time for delivery. *Id.* at 37. Mr. Eckersley intended to deliver the pizzas to Elizabeth Street and then travel to Wyoming for additional deliveries. *Id.* at 39-40.

When Mr. Eckersley arrived at the Elizabeth Street address, the house was dark, so Mr. Eckersley used his flashlight to look for the house number to confirm that he was at the correct location. *Id.* at 41. At this point, two men approached him. *Id.* Specifically, Mr. Eckersley testified that one of the men approached him from behind and started to pull on his arms while the other man grabbed the heat bag, threw it on the ground, and stuck a gun in Mr. Eckersley's ribs. *Id.*

Mr. Eckersley testified he could not see the men's faces because they "had scarfs covering up to the nose or past the nose." *Id.* at 43. He also noted that one of the men was wearing an Atlanta Hawks ball cap while the other man had his hood up. *Id.* One of the men stated, "Don't move. . . .We want your money." *Id.* at 44. The man, who was standing behind Mr. Eckersley and holding his arms, began going through his pockets. *Id.* at 45. The man took Mr. Eckersley's wallet, which contained cash, as well as his

driver's license, social security card, and ATM card. *Id.* He also took Mr. Eckersley's iPhone. *Id.*

At this point, the men demanded that Mr. Eckersley walk down a nearby hill, and after he walked about twenty yards, he turned around in time to observe the men entering a silver SUV. *Id.* at 46. After the men left, Mr. Eckersley walked to a different home on Elizabeth Street, and the homeowner permitted him to use the telephone to call 911. *Id.* at 46-47.

The police arrived at Elizabeth Street within five minutes, and Mr. Eckersley reported his account of the robbery. *Id.* at 47. Mr. Eckersley initially reported that he was robbed by two African American males.[2] *Id.* at 48-49. Specifically, he testified as follows:

> Q: Now, would you dispute that during your initial statement that you believed the two individuals who had victimized you that you identified them as African American?
>
> A: That's correct.
>
> Q: So, you would agree that you made that statement?
>
> A: I did make that statement, yes.
>
> Q: What was it that led you to conclude then that you believe both individuals to be African American?
>
> A: The sounds of the voice, the inflection, the tone, the accent and what—I thought the skin tone was darker.
>
> Q: Now, this incident happened at about 11:00 in the evening?
>
> A: Yes.
>
> Q: So, obviously, not daytime?
>
> A: That's correct.

---

[2] We note that Appellant is Caucasian while his co-conspirator is African American.

- 3 -

Q: Were you at or near any streetlights when this incident occurred?

A: I don't think so, no. I mean, I think there are streetlights on there but not right where we were.

Q: If I understood your earlier testimony, both individuals had the lower portions from their nose down covered by scarfs?

A: That's correct.

Q: One of the individuals had on an Atlanta Hawks hat pulled down close to their eyes?

A: Yes, sir.

Q: Which individual was it that had on the Atlanta Hawks baseball hat, the one who rifled through your pockets or the one that had the handgun?

A: The one with the gun.

Q: So, would it be safe to say that really all you were able to see of both individuals at 11:00 at night would have been their eyes?

A: That's correct, yes.

Q: Do you happen to remember, like, did they have gloves on, no gloves on?

A: I don't remember.

Q: Why do you think it would be that you don't remember that?

A: I looked at the gun a lot.

Q: That was your prime focus?

A: Yeah. I was making sure that thing wasn't going to go off, yeah.

*Id.* at 49-50.

Mr. Eckersley acknowledged that it was possible that he mistakenly believed both assailants were African American and at least one of them could have been some other race. *Id.* at 51-52. He testified that, two days after the robbery, his iPhone was recovered from a lawn on Tomkin Street, which runs parallel to Elizabeth Street. *Id.* at 52. On cross-examination, he

admitted that, on January 6, 2017, at 3:30 a.m., he gave a police statement wherein he identified his robbers as "two black males." *Id.* at 56, 61. On redirect examination, Mr. Eckersley testified that, when he made the 911 call and statement to the police, he was scared and wanted the incident "to be over." *Id.* at 60.

Police Officer Samuel DeSimone confirmed the police were dispatched to a house on Elizabeth Street for an armed robbery, and Mr. Eckersley informed the police that two men had robbed him at gunpoint as he was attempting to deliver two pizzas. *Id.* at 64-66.

Officer DeSimone testified that, since the robbers had apparently taken Mr. Eckersley's car keys, the officer drove Mr. Eckersley to the pizza store. *Id.* Upon arrival at the pizza store, Officer DeSimone obtained the telephone number that had been used to place the pizza order at issue. *Id.* at 67. He noted that two names were associated with the telephone number: Sara Snee and Terry Williamson. *Id.* Through investigative databases, Officer DeSimone discovered that Ms. Snee lived at an apartment on Winter Street, which is a federal housing apartment, and she had no history of living on or near Elizabeth Street. *Id.*

Officer DeSimone, along with fellow officers, including Police Officers Joseph Galeski and Dion Fernandes, proceeded to the Winter Street apartment at approximately 11:45 p.m., but no one answered the door. *Id.* at 68, 71. The officers began checking the area, including the dumpsters, and discovered

a Domino's heat bag in one of the dumpsters. *Id.* at 69. Officer DeSimone confirmed the heat bag had a sticker on it that identified the delivery address for the pizzas as the subject address on Elizabeth Street. *Id.* at 70.

Officer DeSimone returned to the police station, and he retrieved his undercover police vehicle to conduct surveillance at the Winter Street apartment in order to determine who may have made the phone call from that address. *Id.* at 71. Meanwhile, Police Officer Fernandes parked his vehicle on a side street so as to view any vehicles entering or exiting the area; however, no vehicle came into or out of the housing complex within the ten minutes it took Officer DeSimone to leave and return with his undercover vehicle. *Id.* at 72. Officer DeSimone confirmed there was uninterrupted surveillance of the Winter Street apartment. *Id.* at 72-73.

After Officer DeSimone returned with his undercover vehicle, he sat outside the apartment and conducted surveillance. *Id.* at 73. Soon thereafter, a vehicle containing four occupants arrived, parked near the dumpster, and remained parked for approximately five minutes. *Id.* at 73-74. One of the occupants exited the vehicle, and the vehicle left with three occupants still inside. *Id.* at 74. Officer DeSimone alerted Officer Fernandes to follow the vehicle. *Id.*

Officer DeSimone approached the Winter Street apartment, and Sara Snee answered the door. *Id.* at 75. The officer informed Ms. Snee that he was investigating a robbery, and she granted him permission to enter the

apartment. *Id.* Officer DeSimone observed two children in the living room eating pizza out of two boxes of Domino's pizza. *Id.* Officer DeSimone asked Ms. Snee if he could look at the pizza boxes, and after she indicated affirmatively, the officer observed that the sticker on the boxes indicated the pizzas were to be delivered to the Elizabeth Street address, where the robbery had occurred. *Id.* at 76. The sticker also indicated the telephone number from which the call for the pizzas originated. *Id.* at 78. Officer DeSimone testified he discovered and photographed the pizza boxes within about an hour of the initial 911 call pertaining to the robbery. *Id.* at 77-78.

Officer Galeski confirmed that, on the night in question, he was dispatched to the Elizabeth Street address for an armed robbery. *Id.* at 87. The description of the suspects provided to him was: "two males, one with a scarf—[] one with a ball cap covering their face; and the other one with the scarf running up Elizabeth Street." *Id.* He clarified the "ball cap" was reported to be an "Atlanta Hawks ball cap." *Id.* He indicated that, after arriving on scene and speaking to Mr. Eckersley, he went to the Domino's pizza store and confirmed that the delivery was for the Elizabeth Street house. *Id.* at 90.

Officer Galeski testified he left the pizza store and went to the house on Elizabeth Street where the pizza was to be delivered. *Id.* The elderly homeowner informed Officer Galeski that she was not Ms. Snee, she did not know Ms. Snee, and she had not placed an order for pizza. *Id.* Officer Galeski further testified that he took a statement from Mr. Eckersley at approximately

3:30 a.m. on January 6, 2017. *Id.* at 92. Officer Galeski admitted on cross-examination that his report reflects that Mr. Eckersley reported that he believed two black males had robbed him. *Id.* at 94.

Officer Fernandes confirmed the police received a 911 call of an armed robbery and, while other officers responded to the Elizabeth Street address, which Officer Fernandes indicated was in a poorly lit area, he patrolled the southern end of Pittston where the suspects might "pop out" of a side street. *Id.* at 101, 110. While patrolling, he received a dispatch that the order for the pizza originated from a phone registered to Ms. Snee, who lived at the Winter Street apartment, and thus he proceeded to join his fellow officers at the apartment complex. *Id.*

Officer Fernandes confirmed that, after the police seized the heat bag from the dumpster, he conducted surveillance near the apartment complex while Officer DeSimone retrieved his unmarked police vehicle. *Id.* at 101-02. He observed no vehicle enter or exit the complex during this time. *Id.* He testified that, after Officer DeSimone returned, a Ford Focus containing four occupants arrived at the Winter Street complex, and when the vehicle exited, he "got just right up behind the bumper of [the vehicle] at Winter and South Main Street." *Id.* at 103. Officer Fernandes testified he was driving a fully marked patrol car; however, he did not initially activate his lights or sirens. *Id.*

Rather, noticing the Ford Focus now contained three occupants, he ran the license plate and discovered the license plate belonged to a Jeep. *Id.* at 104. Officer Fernandes activated his lights, and the vehicle stopped. *Id.* at 105. Inside of the vehicle, the officer discovered a female driver (later identified as Robin Hurtt), a black male (later identified as Terry Williamson) seated in the front passenger seat, and a white male (later identified as Appellant) seated in the back seat directly behind the driver's seat. *Id.* Appellant was wearing a dark-colored scarf and an Atlanta Hawks ball cap, while Mr. Williamson was eating a slice of pizza. *Id.* at 110-11.

Officer Fernandes requested that all of the occupants exit the vehicle and, when they did so, he noticed the butt of a firearm sticking out of the back of the front passenger's seat into the back seat area. *Id.* at 106, 115. The officer seized the firearm, which appeared to be a handgun; however, upon further inspection, the officer realized it was an air pellet gun. *Id.* at 108-09. On cross-examination, Officer Fernandes noted that Appellant was the only occupant of the vehicle who was "in hands' reach of [it]." *Id.* at 122.

Appellant offered the testimony of Terry Williamson, who testified that, at the time in question, he lived at the Winter Street apartment with his fiancée (Ms. Snee) and Appellant. *Id.* at 133-34. He testified that, at around 9:30 p.m., on January 5, 2017, he was in the vehicle with Ms. Hurtt and her boyfriend, "Miracle," who is an African American male. *Id.* at 133.

Although they had just met, Mr. Williamson and Miracle decided to rob Domino's. *Id.* He testified he used a cell phone registered to his Winter Street address to place an order for pizza to lure the delivery person to a house on Elizabeth Street. *Id.* at 134-35. Mr. Williamson testified he chose the location because it was poorly lit. *Id.* at 135.

Mr. Williamson indicated that, after the deliveryman arrived, he and Miracle "jumped him," with Miracle grabbing him from behind while Mr. Williamson confronted him from the front. *Id.* Mr. Williamson testified they told the deliveryman to empty his pockets and they then ran back to the vehicle, which was parked nearby. *Id.* at 136. He testified he was wearing the Atlanta Hawks ball cap but not a scarf during the robbery. *Id.*

Mr. Williamson testified that, on the way back to the Winter Street apartment, Miracle threw the deliveryman's iPhone out of the window. *Id.* at 137. He further testified that, upon arrival at the apartment, they took the pizza inside to Ms. Snee and Appellant, at which time Appellant asked if he could wear the Atlanta Hawks ball cap because it matched his outfit. *Id.* at 139.

Mr. Williamson indicated he gave Appellant permission to borrow the hat, and then the five adults (including Ms. Hurtt, Ms. Snee, Miracle, Appellant, and Mr. Williamson) drove in one car to Old Forge, where they dropped off Miracle. *Id.* at 138-39. They then returned to the Winter Street apartment and dropped off Ms. Snee. *Id.* Mr. Williamson testified he, Ms. Hurtt, and

Appellant were traveling towards Appellant's girlfriend's house when the police stopped the vehicle. *Id.*

He testified the pellet gun, which was seized by the police, belonged to Miracle but he was the one who held it during the robbery. *Id.* at 139. He denied that Appellant was present during the robbery and, in fact, he testified Appellant was home the entire time. *Id.* at 140.

On cross-examination, Mr. Williamson admitted he gave a statement to Officer Fernandes during the early morning hours of January 6, 2017. *Id.* at 142. With regard to the statement, the following exchange occurred at trial:

Q: You would agree with me, that you told Officer Fernandes that you were not involved in any robbery that night; is that correct?

A: Correct.

Q: Would you also agree with me, that you said to Officer Fernandes that night to take a look at your wrap sheet and that you had never done anything like that, meaning a robbery?

A: Right.

Q: Would you admit, that you also told Officer Fernandes that night that you don't roll with the gun?

A: No. We never even talked about the gun.

Q: You're calling Officer Fernandes a liar?

A: Exactly. We never talked about a gun.

Q: So, if it's in Officer Fernandes' report that during the conversation that he had with you during the early morning hours of January 6th, 2017, that you said to him that you don't roll with the gun, that Officer Fernandes is a liar?

A: Why not? So you saying cops don't jack up Affidavits?

Q: So, basically, you're calling him a liar?

A: You not understand what I'm saying? I know the conversation that we had.

\*\*\*

Q: Would you also say, that you did not say to Officer Fernandes during that same conversation that [Appellant] is a roller?

A: Never. The only time [Appellant] came up during the interview, was when [h]e said [Appellant] told him I did the robbery.

Q: So, you're saying Officer Fenandes told you—

A: Told me.

Q:--that [Appellant] did the robbery, that [Appellant] said you did the robbery?

A: Your brother already cooperated and told us that you had something to do with the robbery. I told him, if he told you that, then why are you still talking to me?

Q: Well, if that were the case, if at the time that during that conversation that had occurred, that Officer Fernandes tells you that [Appellant] is blaming you for the robbery, would you agree with me that nowhere, and at no time during that conversation, do you say to Officer Fernandes, Hold on a second. Miracle is your guy?

A: Not once.

Q: No?

A: I still [didn't] even admit to the robbery.

*Id.* at 143-45.

Mr. Williamson admitted he has prior convictions for unsworn falsification to authorities, receiving stolen property, and attempt to commit theft by unlawful taking. *Id.* at 141.

The Commonwealth called Officer Fernandes as a rebuttal witness. Officer Fernandes testified that, when he interviewed Mr. Williamson after the robbery, Mr. Williamson reported Ms. Hurtt picked him up in Avoca at around 8:00 p.m. *Id.* at 153-54. He told the officer they then went to Winter Street to pick up Ms. Snee and Appellant, and then they travelled to a Burger King and back to Scranton. *Id.* at 154. Mr. Williamson told the officer he knew

nothing about the robbery and he does not "roll with a gun." *Id.* at 155. However, he told Officer Fernandes that Appellant "is the one that rolls with a gun." *Id.* Officer Fernandes testified that, during the interview, Mr. Williamson continued to deny his involvement in the robbery, and he never mentioned a person named "Miracle." *Id.* at 156.

At the conclusion of all testimony, the jury convicted Appellant of the offenses indicated *supra*. On December 4, 2017, the trial court sentenced Appellant to 69 months to 138 months in prison for robbery; 57 months to 114 months in prison for conspiracy (robbery), to run consecutively to the robbery sentence; 16 months to 32 months in prison for conspiracy (possession of instrument of crime), to run concurrently to the other counts; and no further penalty for the remaining crimes.

Appellant did not file post-sentence motions; however, this timely, counseled appeal followed on December 22, 2017. All Pa.R.A.P. 1925 requirements have been met.

Appellant's first claim is that the evidence was insufficient to sustain his convictions.

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak

and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the finder of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Brooks*, 7 A.3d 852, 856-57 (Pa.Super. 2010) (citations omitted).

In this case, Appellant's sufficiency argument is specific in nature; to wit, he avers the evidence was insufficient to prove that he committed the crimes. In this vein, he avers the evidence reflects that two black males committed the robbery, and since he is Caucasian, he was not one of the perpetrators. Further, he avers the evidence reveals a man named "Miracle" committed the robbery with Mr. Williamson.

In light of Appellant's specific sufficiency claim, we need not conduct a thorough review of the evidence to determine whether it can support a finding that all of the elements have been met. Rather, we will focus on the specific issue raised by Appellant: whether the evidence was sufficient to establish that Appellant was the perpetrator of the crimes.

Here, viewing the evidence in the light most favorable to the Commonwealth, as verdict winner, we conclude the evidence sufficiently establishes that Appellant was a perpetrator of the crimes. For instance, the evidence reveals two men lured a pizza deliveryman to a poorly lit area on

Elizabeth Street by placing an order with a phone registered to a specific Winter Street apartment. Appellant, Mr. Williamson, and Ms. Snee were the adults residing at the Winter Street apartment.

The deliveryman arrived at the Elizabeth Street address at 11:00 p.m., but the house was dark. Suddenly, two men approached him. The men had their faces covered with dark-colored scarves, with one man wearing a hood and the other an Atlanta Hawks ball cap. While one of the men placed a firearm against the deliveryman's ribs, the other man held him from behind. After removing the deliveryman's possessions, the two men fled in a vehicle.

The police responded to the location within five minutes of the robbery, and they transported the deliveryman to the Domino's pizza store where they discovered the order had been placed using the number registered to Ms. Snee. At 11:45 p.m., the police responded to the Winter Street apartment but discovered no one was home. However, they found the deliveryman's heat bag inside of a dumpster just outside of the apartment.

A short time later, after Officer DeSimone left and returned with his unmarked police vehicle, he observed a vehicle with four occupants (Ms. Snee, Ms. Hurtt, Mr. Williamson, and Appellant) stop outside of the Winter Street apartment. One of the occupants (Ms. Snee) went inside, while the other three drove away. Ms. Snee granted Officer DeSimone entry into the apartment, and he discovered children eating the stolen pizza.

Meanwhile, Officer Fernandes followed the vehicle and pulled it over. Inside, he discovered Ms. Snee, Appellant, who was wearing a dark-colored scarf and an Atlanta Hawks ball cap, and Mr. Williamson, who was eating a slice of pizza. Further, Officer Fernandes observed the butt of a gun sticking out behind the front passenger seat; the gun was within hands' reach of Appellant only.

At the police station, Mr. Williamson denied any involvement in the robbery. When the police confronted him with the idea that Appellant had implicated him, Mr. Williamson informed the police that Appellant "is the one who rolls with a gun." N.T., 10/30/17, at 155. At trial, Mr. Williamson admitted he was involved in the robbery, but he denied Appellant's involvement. Based on the aforementioned, and applying our standard of review, we conclude the evidence was sufficient to establish Appellant perpetrated the crimes of which he was convicted. *See Brooks*, *supra*.

We note that we reject Appellant's claim that, since the deliveryman reported to police that he was robbed by two African American men, and Appellant is Caucasian, the evidence of his identity was insufficient. In addressing this specific claim, the trial court relevantly indicated the following in its Rule 1925(a) opinion:

> [Appellant] notes in his [Rule 1925(b)] Statement that the evidence of record reflects that, although [Appellant] is Caucasian, the crime was committed by two black males. Williamson, the co-[conspirator] in this case, is African American. Although [Appellant] is Caucasian, Eckersley's initial report and written statement to police made five hours after the incident

indicated that both of his assailants were black. The Commonwealth addressed this issue through the testimony of Officer Fernandes and Eckersley himself. Officer Fernandes testified that the area of Elizabeth Street where the robbery took place is not well illuminated, and that the lighting in that vicinity is poor. Eckersley also said that the street was dark, having no streetlights where the robbery took place. Eckersley testified that at the time of the incident, he was only able to see the eyes of both assailants. Both men had scarves obscuring much of their faces, and the man behind Eckersley had his head covered with a hoodie. He testified that the man holding the gun was wearing an Atlanta Hawks baseball hat. Eckersley explained that he had described his assailants as African American in part because of the "sounds of the voice, the inflection, the tone, [and] the accent" with which they spoke. He testified [at trial] that it was conceivable that he could have mistaken the two individuals as both being African American, and it was possible that they could have been another race or ethnicity.

Trial Court Opinion, filed 3/19/18, at 6-7 (citations to record omitted).

We note the jury was free to weigh the testimony, and viewing the entire record, the evidence was sufficient to establish Appellant's identity as the perpetrator. *See Brooks*, *supra*.

Further, we reject Appellant's claim the evidence reveals that "Miracle," and not Appellant, was Mr. Williamson's co-conspirator with whom he committed the robbery. As the trial court noted, Mr. Williamson, who had previous convictions for unsworn falsification, receiving stolen property, and criminal attempt at theft by unlawful taking, testified that a man named "Miracle," whom he met for the first time on the night of the robbery, committed the crime with him. *See* Trial Court Opinion, filed 3/19/18, at 9. Further, as the trial court noted, Mr. Williamson did not identify or mention the name "Miracle" prior to trial. *See id.*

The jury was free to believe all, part, or none of Mr. Williamson's testimony, and the fact the jury apparently did not believe Mr. Williamson's identification of his co-conspirator as "Miracle" does not render the evidence insufficient as to Appellant. **See Brooks**, **supra**.

Appellant's final claim is the trial court abused its discretion in applying the deadly weapon enhancement ("DWE") in sentencing Appellant. Specifically, Appellant contends the evidence reveals Mr. Williamson, as opposed to Appellant, was holding the deadly weapon during the offense. We agree with Appellant that this issue implicates the discretionary aspects of Appellant's sentence. **Commonwealth v. Solomon**, 151 A.3d 672, 676 (Pa.Super. 2016).

When an appellant challenges the discretionary aspects of his sentence, we must consider his brief on this issue as a petition for permission to appeal. **See Commonwealth v. Moury**, 992 A.2d 162 (Pa.Super. 2010). Prior to reaching the merits of a discretionary sentencing issue,

> [this Court conducts] a four[-]part analysis to determine: (1) whether [A]ppellant has filed a timely notice of appeal, **see** Pa.R.A.P. 902 and 903; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence, **see** Pa.R.Crim.P. [720]; (3) whether [A]ppellant's brief has a fatal defect, Pa.R.A.P. 2119(f); and (4) whether there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code, 42 Pa.C.S.A. § 9781(b).

**Moury**, 992 A.2d at 170 (citation omitted).

Here, Appellant filed a timely notice of appeal and preserved his issue during the sentencing hearing.[3]  His brief contains a separate Rule 2119(f) statement, and his issue presents a substantial question permitting our review.  **Solomon**, 151 A.3d at 676.  Accordingly, we shall proceed to review the merits of Appellant's sentencing claim.

It is well-settled that:

Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion.  In this context, an abuse of discretion is not shown merely by an error in judgment.  Rather, the appellant must establish, by reference to the record, that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision.

**Commonwealth v. Gonzalez**, 109 A.3d 711, 731 (Pa.Super. 2015) (quotation omitted).

Here, Appellant does not dispute the trial court applied the DWE based on Appellant's possession (as opposed to use) of a deadly weapon, in accordance with § 303.10(a).[4]  **See** Trial Court Opinion, filed 3/19/18, at 18.

_____

[3] He also preserved his issue in his court-ordered Pa.R.A.P. 1925(b) statement.

[4] 204 Pa.Code § 303.10(a) provides:
**§ 303.10. Guideline sentence recommendations: enhancements**.
(a) *Deadly Weapon Enhancement.*
   (1) When the court determines that the offender possessed a deadly weapon during the commission of the current conviction offense, the court shall consider the DWE/Possessed Matrix (§

Possession, for purposes of the sentencing guidelines, means "[o]n a defendant's person or within the defendant's immediate control." 42 Pa.C.S.A. § 2154(b).[5]

Appellant argues the DWE does not apply because his co-conspirator (Mr. Williamson) held the weapon, and Appellant never held it. However, even assuming, *arguendo*, Appellant did not hold the deadly weapon during the offense, the evidence establishes that the deadly weapon was within his immediate control.

In several cases, we have held that a gun used by a defendant's co-conspirator was within the defendant's immediate control. For instance, in **Commonwealth v. Bowen**, 612 A.2d 512 (Pa.Super. 1992), the defendant was one of six persons who assaulted the victims. Some, possibly all of the

_____

303.17(a)). An offender has possessed a deadly weapon if any of the following were on the offender's person or within his immediate physical control:

(i) Any firearm, (as defined in 42 Pa.C.S. § 9712) whether loaded or unloaded, or
(ii) Any dangerous weapon (as defined in 18 Pa.C.S. § 913), or
(iii) Any device, implement, or instrumentality designed as a weapon or capable of producing death or serious bodily injury where the court determines that the offender intended to use the weapon to threaten or injure another individual.

204 Pa. Code § 303.10(a) (emphasis in original).

[5] Appellant presents no claim that the weapon used during the offense was not a "deadly weapon." Rather, his claim focuses on whether the evidence reveals Appellant, as opposed to solely his co-conspirator, possessed a deadly weapon for purposes of applying the DWE.

assailants had guns. *Id.* at 513–14. We held that the sentencing court erred in failing to apply the DWE for possession of a weapon, because the defendant either possessed a gun or was "inches away" from one of the gunmen who participated in the crime. *Id.* at 515–16.

Likewise, in *Commonwealth v. Hatcher*, 746 A.2d 1142 (Pa.Super. 2000), the defendant and two co-conspirators approached the victim and started punching him. During the assault, one of the co-conspirators pulled a handgun and beat the victim with the butt of the gun. *Id.* at 1143. Although the defendant never held the weapon, he was in "close physical proximity" to the co-conspirator who used the gun. *Id.* at 1145. That was sufficient to demonstrate possession within the meaning of Section 2154(b). *Id.*

Further, in *Commonwealth v. Pennington*, 751 A.2d 212 (Pa.Super. 2000), the defendant was one of five co-conspirators involved in a robbery. One man held the victim at gunpoint while the others kicked him, punched him, and searched his pockets. *Id.* at 214–15. This Court, citing *Bowen* and *Hatcher*, concluded the trial court properly applied the DWE because the gun was within the defendant's immediate control. *Id.* at 216–17. In contrast, this Court held the DWE did not apply to a defendant who was waiting in a getaway car several blocks from a jewelry store in which his co-conspirator conducted an armed robbery. *Commonwealth v. Greene*, 702 A.2d 547, 552–53 (Pa.Super. 1997).

Instantly, the record reveals that either Appellant or his co-conspirator (Mr. Williamson) held a deadly weapon against Mr. Eckersley's ribs while the other man held him from behind and rifled through his pockets. Appellant either held the weapon or was "inches away" from his co-conspirator as he held the weapon during the offense. Thus, we conclude the trial court correctly applied the DWE because, at the very least, Appellant was in close physical proximity to an armed co-conspirator, and therefore, the weapon was within his immediate control.

Accordingly, we find no merit to Appellant's discretionary aspect of sentencing claim.

For all of the foregoing reasons, we affirm.

Affirmed.

Judge Stabile joins the Opinion.

Judge Shogan concurs in the result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/20/2018