J-S36007-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| RAFEAL KAREEM BRADSHER | : | |
| | : | |
| Appellant | : | No. 1487 WDA 2024 |

Appeal from the Judgment of Sentence Entered October 28, 2024
In the Court of Common Pleas of Erie County
Criminal Division at No(s): CP-25-CR-0003270-2023

BEFORE:   PANELLA, P.J.E., NICHOLS, J., and FORD ELLIOTT, P.J.E.[*]

MEMORANDUM BY PANELLA, P.J.E.:          **FILED: DECEMBER 1, 2025**

Rafeal Kareem Bradsher appeals from the judgment of sentence entered in the Court of Common Pleas of Erie County after he was convicted of criminal conspiracy[1] and robbery[2] at a non-jury trial. On appeal, Bradsher challenges the sufficiency and weight of the evidence and alleges a violation of his rights guaranteed by the Confrontation Clause. After careful consideration, we affirm.

We glean the following factual and procedural history from the certified record. On the evening of September 29, 2023, husband and wife Dion and

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S.A. § 903.

[2] 18 Pa.C.S.A. § 3701(a)(1)(ii).

Justine Williams were victims of an armed robbery that occurred at their residence in Millcreek Township. Bradsher and co-defendant Dayquan Graham were arrested and charged in connection with the incident. On April 4, 2024, the trial court held a hearing on Bradsher's *pro se* omnibus pretrial motion and petition for writ of habeas corpus at which victim Dion Williams appeared and testified. The trial court denied Bradsher's motions on May 1, 2024. The following day, the Commonwealth filed notice of its intent to seek the imposition of a ten-year mandatory minimum sentence, pursuant to 42 Pa.C.S.A. § 9714(a), based on Bradsher's prior aggravated assault conviction. Bradsher requested appointment of counsel, and on August 22, 2024, the Erie County Public Defender's Office entered its appearance on Bradsher's behalf.

On September 5, 2024, the Commonwealth filed a motion *in limine* seeking to introduce evidence of Bradsher's prior period of incarceration, during which he and victim Dion Williams had been cellmates at SCI Albion for an extended time. The Commonwealth sought to introduce this evidence to support its theory that Bradsher targeted Williams, who was incarcerated for drug-related offenses, "because he knew from interactions and/or knowledge learned while housed in the same prison with [ Williams] that [ Williams] was a prominent drug dealer in the Erie area." Motion in Limine, 9/5/24, at ¶ 9. On September 13, 2024, the Commonwealth filed an additional motion *in limine* seeking to introduce Officer Brian Shapter's body-worn camera ("bodycam") and MVR footage into evidence at trial. The Commonwealth

argued that the statements made by the victims in the footage were admissible, nontestimonial statements because they were gathered by officers to assist in an ongoing emergency, and not by "detectives investigating the scene and assembling evidence." Motion in Limine, 9/13/24, at ¶ 17. Neither defendant filed a response in opposition, and the court deferred ruling on the motions until trial.

At the joint trial held on September 13, 2024, counsel for Bradsher was joined by Attorney Keith H. Clelland, Esq. for Graham. The court heard argument on the Commonwealth's motions *in limine*. Attorney Clelland objected to the introduction of Officer Shapter's bodycam footage, arguing that the statements rendered therein were hearsay. ***See*** N.T. Trial, 9/16/24, at 12-14, 16-17. Notably, counsel for Bradsher neither objected to the introduction of the bodycam footage nor offered any argument against its admission.[3] The trial court granted the Commonwealth's motions *in limine*, ***see id.*** at 17, 18, and the Commonwealth proceeded to present the testimony of six witnesses, including that of victim Dion Williams.[4]

Dion Williams testified that on September 29, 2023, he and his wife had returned to their home at 411 Kelso Drive after an evening of "partying" and

---

[3] Counsel for Bradsher did however note for the record that she "would have had arguments to challenge" the Commonwealth's motion *in limine* seeking to introduce evidence of Bradsher's prior period of incarceration "[i]f it had not been a bench trial[.]" N.T. Trial, 9/16/24, at 18.

[4] Neither Justine Williams nor Officer Shapter testified at trial.

upon opening the door, he was thrown to the ground, tied up, and blindfolded with duct tape. *Id.* at 28-29, 32. Williams stated that once he was tied up, he was struck with a hard object, which he surmised was something akin to "a vase, a brick, [or] a rock[.]" *Id.* at 30. When asked how many people were in the house, Williams stated that it was hard for him to remember and that he did not see anybody because it was dark, but he guessed that it was probably "two to three people." *Id.* at 29. Williams stated that he remembered hearing multiple voices and the sound of people rummaging through his belongings. *Id.* at 30. Williams testified that while he was restrained, the assailants went through his pockets and asked for his wallet, money, jewelry, and videogame systems. *Id.* at 33. When Williams was asked what stood out to him when he heard the assailants' voices, the following exchange ensued:

[Williams:] It sounded kind of like not funny but [] it sounded like just—how could I put it. I don't know. … I really couldn't tell.

[Prosecution:] Did they sound like they were from Erie?

[Williams:] Yeah.

[Prosecution:] So do you remember talking to the police that night?

[Williams:] No, I do not.

[Prosecution:] If I told you that you told the police that they had Philadelphia-like accents—

Attorney Clelland: Objection, Your Honor. It's leading this witness.

The Court: Sustained.

[Prosecution]: Your Honor, he said that they sounded like they were from here. He told the police that they had Philadelphia accents.

The Court: Yeah, but you can't ask a leading question.

[Prosecution:] So today you're saying they sound like they were from here.

[Williams:] Yes, and if I did say anything like Philadelphia, I don't think I actually said that specific area. I said it was a [] city accent, like a Chicago, New York thing like that. I don't recall specifically stating no Philadelphia, New Jersey, New York accent.

*Id.* at 31-32 (unnecessary capitalization omitted). Williams testified that he was eventually able to free himself of his restraints and noticed that his wallet, his videogames, a few pairs of his shoes, approximately $1,000, and the keys to his Audi were missing. *See id.* at 33-34. Williams denied that any other car keys were missing, and over Attorney Clelland's objection, the prosecution asked Williams to read the testimony he previously rendered on the subject at a prior hearing:

[Williams:] Yeah, I had [] two sets of Audi keys. I had two sets of Charger keys. The only keys … I got back was my Audi key and my other Charger key. You got back your Charger key? Yeah. When did you get it back? I don't know if my wife had found it or she had picked it up because, like I said, I had two sets of keys.

***

The Court: When you say Charger keys, what do you mean by that?

[Williams]: Oh, it's just [] a key to my car. It's actually Challenger keys. I don't know where Charger—

[Counsel for Bradsher]: I'm sorry, Your Honor. Actually, a what?

Attorney Clelland: A Challenger.

[Williams]: A Challenger.

[Prosecution]: The make and model is the Dodge Challenger.

*Id.* at 35-36. Williams testified that his wife spoke with police that night, and that officers asked him questions about a gash he sustained on his head, which was bleeding "a little bit." *Id.* at 36.

The Commonwealth then introduced Officer Shapter's bodycam footage and played the video in two segments from timestamp 0:00 to 3:25 and from timestamp 8:48 to 19:46. *See* Commonwealth's Exhibit 1. The first segment of footage depicts Officer Shapter responding to a report of a suspicious vehicle in the area of 411 Kelso Drive, when he is abruptly flagged down by Justine Wiliams, who informed Shapter that she had just been pistol whipped and robbed and that the assailants fled the scene in a black Kia.[5] Officer Shapter then left the scene in search of the vehicle to no avail. In the second segment of footage, Officer Shapter returned to the scene and once again spoke with the victims. Justine Williams explained that she entered the home first and saw a male behind the door, who pulled a gun on her and told her to

---

[5] A male voice in the video can be heard describing the vehicle as a black Honda.

get on the ground. She indicated that the assailants tied her hands with rope and that they bound her husband with rope, pistol whipped him and repeatedly asked where his money was located. She described two of the assailants as young black males wearing navy blue zip-up sweatshirts with hoods, facemasks covering their noses and mouths, and blue surgical gloves. She stated that while inside the home, the assailants made a phone call to someone waiting outside in a vehicle and directed the driver to pick them up.

On cross-examination, Dion Williams testified that he knew Bradsher prior to the robbery and that he was "90 to 100 percent" confident he would have recognized Bradsher's voice if he had been one of the assailants. N.T. Trial, 9/16/24, at 43, 44. The defense introduced a notarized, handwritten letter signed by both Justine and Dion Williams that was sent to the District Attorney's Office and filed with the trial court on August 8, 2024. *See* Defendants' Exhibit A. In the letter, the victims indicated that they did not wish to proceed with the prosecution because they did not believe Bradsher and Graham were the assailants, and they "fe[lt] bad for having innocent people in jail." *Id.* When asked what prompted him to send the notarized statement, Dion Williams testified that when he and Justine saw the individuals charged for the crime at a hearing, they realized the defendants did not fit the description Justine had previously given. *See* N.T. Trial, 9/16/24, at 51. Specifically, Dion indicated that Justine described the assailants as "tall, dark skin and [having] dreads[,]" and neither Bradsher nor

Graham fit that description. *Id.* at 52. On redirect, the prosecution asked Williams whether the man Justine described could have been a third assailant that was not apprehended, and Williams acquiesced to such possibility. *See id.* at 61.

Corporal Ryan Presnar of the Millcreek Township Police Department testified that at approximately midnight on September 29, 2023, he heard over the radio that officers were being dispatched to respond to reports of a suspicious vehicle and to a separate report of two black males in dark clothing fleeing a house after robbing the victims at gunpoint. *See id.* at 66. Presnar stated that as he drove northbound on Peninsula Drive and approached 12th Street, he observed two black males walking on a sidewalk. *See id.* at 67. As Presnar approached, one male began running eastbound through a parking lot, while the other continued walking southbound on Peninsula Drive. *See id.* Presnar relayed his observations to other units over radio, yelled to the fleeing male to stop, and pursued him through the parking lot in his vehicle until the male escaped through a hole in the parking lot fence. *Id.* at 68. Presnar then waited for a second officer to respond to his location before pursuing the male further. *See id.* at 68. Presnar testified that he did not see the face of either male. *See id.* at 69.

Detective Luke Passerotti of the Millcreek Township Police Department photographed the crime scene at 411 Kelso Drive on September 29th. Passerotti testified that he took photographs of an air conditioning unit found

hanging out of the victims' bedroom window, a cinderblock located underneath the bedroom window, a blue surgical glove found outside the home, a piece of rope used to tie the victims located between the victims' vehicles, and a blood spot located on carpeting inside the home. *See id.* at 76-78; Commonwealth's Exhibits 4-10. When asked on cross-examination whether DNA analysis was performed on the blood spot, Passerotti indicated that he attributed it to Dion Williams. *See id.* Passerotti testified that when he attempted to interview Graham and Bradsher, Bradsher indicated that he was from Philadelphia. *See id.* at 79. Passerotti further testified that Dion Williams described one of the assailants as having a very clear accent and that when he informed Williams of the suspects' names during the course of the investigation, Williams disclosed that he and Bradsher were prison cellmates in Philadelphia. *See id.* at 79, 82.

Officer Jacob Kindle of the Millcreek Township Police Department testified that while on patrol on the evening of September 29, 2023, he overheard on the radio that Officer Shapter had been dispatched to respond to a report of a suspicious vehicle on Kelso Drive, where two victims reported being robbed at gunpoint. *See id.* at 89. Kindle also heard Shapter describe the suspects as black males wearing all black clothing and Corporal Presnar report observing two individuals matching the description. *See id.* at 89-90. Kindle immediately dispatched to the area Presnar had reported last seeing the suspects. *See id.* at 90. While traveling southbound on Filmore Avenue,

Kindle observed a black male wearing all black clothing walking eastbound on 11th Street, and as he approached in his vehicle, the male began running. *See id.* at 91. Kindle proceeded to pursue the male on foot until he lost sight of him as he ran through a row of arborvitaes trees. *See id.* Kindle and other responding officers eventually located the male, whom he later identified as Graham, in the arborvitaes trees and took him into custody. *See id.* at 92. Graham was wearing black clothing at the time of his arrest, and a black ski mask was found on his person. *See id.* at 93.

Officer Christopher Larsen of the Millcreek Township Police Department was also on patrol on the evening of September 29, 2023, when he heard Corporal Presnar report that one of two black males was heading southbound on Peninsula Drive. *See id.* at 95. As Larsen approached the intersection of 12th Street and Industrial Drive, he observed an individual, whom he later identified as Bradsher, walking southbound across West 12th Street that fit Presnar's description. *See id.* at 95-96. Larsen made contact with Bradsher, who was breathing heavily, stuttering over his words, and acting nervous and jittery. *See id.* at 97. Larsen also observed blood on Bradsher's knuckles, which Bradsher attributed to doing pushups on cement. *See id.* Larsen testified that when he patted Bradsher down, he located "a set of car keys that were said to be missing from the scene." *Id.* at 97. Larsen clarified that the keys belonged to the Dodge located at the crime scene and were returned that same night. *See id.* at 99.

At the close of the Commonwealth's case-in-chief, both defendants moved for judgments of acquittal, which the court denied. Prior to rendering its verdict, the court stated that, in its opinion, Williams was "not credible as a witness at all[,]" while all five testifying officers were credible. **See id.** at 123. The court found Bradsher and Graham guilty of conspiracy and robbery. On October 28, 2024, the court imposed a mandatory minimum sentence of ten to twenty years' imprisonment for Bradsher's conspiracy to commit robbery conviction and a concurrent sentence of ten to twenty years for his robbery conviction to be followed by one year of re-entry supervision. Bradsher timely filed a post-sentence motion seeking a new trial based on the weight of the evidence, which the trial court denied on November 13, 2024. Bradsher timely filed a notice of appeal. Both Bradsher and the trial court have complied with Pa.R.A.P. 1925. **See** Pa.R.A.P. 1925(a), (b).

On appeal, Bradsher raises the following questions for our review:

1. Is the eviden[ce] sufficient to sustain [Bradsher's] convictions for conspiracy and robbery as the Commonwealth did not demonstrate that [Bradsher] was one of the perpetrators of the crimes?

2. Did the trial court err[] when it granted the Commonwealth's motion to admit the police body camera footage of Justine Williams into evidence where the statements constituted testimonial hearsay in violation of the Confrontation Clause?

3. Did the trial court abuse its discretion when it denied [Bradsher's] motion for a new trial on weight of the evidence grounds?

Appellant's Brief, at 8 (unnecessary capitalization, trial court answers, and suggested answers omitted).

In his first issue, Bradsher challenges the sufficiency of the evidence to sustain his convictions of robbery and conspiracy to commit robbery.

"Because a determination of the sufficiency of the evidence presents a question of law, our standard of review is *de novo* and our scope of review is plenary." **Commonwealth v. Henck**, 342 A.3d 726, 731-32 (Pa. Super. 2025) (internal quotation marks and citation omitted).

> The standard we apply in reviewing the sufficiency of the evidence is whether, viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying this test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that, as a matter of law, no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. [ T]he trier of fact, while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part, or none of the evidence.

**Commonwealth v. Dixon**, 276 A.3d 794, 800 (Pa. Super. 2022) (brackets and citation omitted). Moreover, a "[m]ere conflict in the evidence does not render it insufficient; any discrepancies are for the [fact-finder] to resolve."

***Commonwealth v. Hewlett***, 189 A.3d 1004, 1010 (Pa. Super. 2018) (citation omitted).

"[T]o prove the existence of a criminal conspiracy, the Commonwealth must demonstrate that the defendant: (1) entered into an agreement to commit or aid in an unlawful act with another person or persons, (2) with a shared criminal intent and, (3) an overt act done in furtherance of the conspiracy." ***Commonwealth v. Wellman***, --- A.3d ----, 2025 WL 2383852 at *3 (Pa. Super. filed Aug. 18, 2025) (citations omitted); ***see*** 18 Pa.C.S.A. § 903(a). Furthermore, "[a] person is guilty of robbery if, in the course of committing a theft, he[ *inter alia*]: … threatens another with or intentionally puts him in fear of immediate serious bodily injury[.]" 18 Pa.C.S.A. § 3701(a)(1)(ii).

Notably, Bradsher does not argue that the Commonwealth's evidence was insufficient to sustain his conspiracy and robbery convictions because it failed to establish any specific element of either crime. Rather, Bradsher avers the evidence was insufficient because it failed to establish his identity as a perpetrator of either crime, and consequently, his convictions "relied entirely on speculation and conjecture." Appellant's Brief, at 22. Given the specific sufficiency claim Bradsher raises, "we need not conduct a thorough review of the evidence to determine whether it can support a finding that all of the elements have been met." ***Commonwealth v. Matthews***, 196 A.3d 242, 249 (Pa. Super. 2018). Accordingly, we turn to the specific issue of whether the

Commonwealth's identification evidence was sufficient to prove that Bradsher was the perpetrator of the crimes committed against Dion and Justine Williams.

> Evidence of identification need not be positive and certain to sustain a conviction. Although common items of clothing and general physical characteristics are usually insufficient to support a conviction, such evidence can be considered to establish identity in conjunction with other circumstances and identification testimony.

*Commonwealth v. Williams*, 255 A.3d 565, 579 (Pa. Super. 2021) (quotation marks, brackets, and citations omitted). Furthermore, "[o]ut-of-court identifications are relevant to our review of sufficiency of the evidence claims, particularly when they are given without hesitation shortly after the crime while memories were fresh. Given additional evidentiary circumstances, any indefiniteness and uncertainty in the identification testimony goes to its weight." *Commonwealth v. Orr*, 38 A.3d 868, 874 (Pa. Super. 2011) (*en banc*) (citations and internal quotation marks omitted).

Viewing the evidence in the light most favorable to the Commonwealth, as verdict winner, we conclude the evidence was sufficient to prove, beyond a reasonable doubt, that Bradsher was a perpetrator of the crimes, notwithstanding the lack of an in-court identification. Here, the evidence elicited at trial established that at least two men entered the victims' home while they were not present. When the victims returned home, the perpetrators bound the victims with rope and blindfolded victim Dion Williams, who consequently could not see the perpetrators. Shortly after the robbery

- 14 -

occurred, victim Justine Williams adamantly described the perpetrators to Officer Shapter as young black males wearing facemasks, surgical gloves, and navy-blue zip-up sweatshirts with hoods. Bradsher and Graham, two black males wearing dark clothing, were observed walking together within the vicinity of the crime scene soon after the crime occurred. When Officer Presnar approached the pair, Graham fled, and he continued to evade responding officers until he was found hiding in a row of arborvitaes trees. *See Commonwealth v. Holt*, 273 A.3d 514, 546 (Pa. 2022) (While evidence of flight is by itself insufficient to sustain a conviction, such "evidence is relevant and admissible to establish an inference of guilt.") (citation omitted). The trial court had before it the convincing evidence that when Bradsher and Graham were apprehended, officers recovered what were later determined to be the victims' missing set of Dodge Challenger keys from Bradsher's person and a black ski mask from Graham's person. Additionally, officers observed a blood stain, attributable to the gash the perpetrators had inflicted upon Dion Williams' head, at the crime scene, and Officer Larsen observed blood on Bradsher's knuckles when he was apprehended. Officer Larsen also testified that during their interaction, Bradsher was breathing heavily, stuttering, and acting nervous and jittery.

Moreover, the trial court was free to believe all, part, or none of Dion Williams' testimony concerning the accent or dialect of the perpetrators and his belief that he would have been able to identify Bradsher's voice if he had

been one of the perpetrators; this Court cannot reweigh the evidence or supplant our own credibility determinations with that of the fact-finder. *See Dixon*, 276 A.3d at 800. Similarly, the victims' signed statement expressing their belief that Bradsher and Graham were not the perpetrators of the robbery does not render the identification evidence insufficient. The evidence established that there were at least two, but possibly more, assailants, leaving it up to the finder of fact to determine if the assailant Justine described as having "dreads" was a third assailant that was never apprehended. N.T. Trial, 9/16/24, at 61.

Therefore, in accordance with our standard of review, we conclude that the Commonwealth presented sufficient evidence to prove that Bradsher was a perpetrator of conspiracy and robbery. Accordingly, Bradsher is not entitled to relief on his first issue.

In his second issue, Bradsher challenges the trial court's decision to grant the Commonwealth's motion *in limine*.

> When ruling on a trial court's decision to grant or deny a motion *in limine*, we apply an evidentiary abuse of discretion standard of review. The admission of evidence is committed to the sound discretion of the trial court, and a trial court's ruling regarding the admission of evidence will not be disturbed on appeal unless that ruling reflects manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support to be clearly erroneous.

*Commonwealth v. Dodd*, 339 A.3d 514, 517 (Pa. Super. 2025) (citation omitted).

Bradsher avers the trial court erred in permitting the Commonwealth to introduce Officer Shapter's bodycam footage depicting his interaction with the victims shortly after the crime occurred because Bradsher "never had an opportunity to cross-examine [Justine] Williams and a large portion of the [bodycam] footage contained statements that were testimonial in nature" in violation of the Confrontation Clause.[6] Appellant's Brief, at 22. Bradsher is not entitled to relief.

Our Rules of Appellate Procedure provide that "[i]ssues not raised in the trial court are waived and cannot be raised for the first time on appeal." Pa.R.A.P. 302(a); *see Commonwealth v. Spone*, 305 A.3d 602, 609 (Pa. Super. 2023) ("Even issues of constitutional dimension cannot be raised for the first time on appeal.") (citation omitted). Accordingly, where a defendant fails to launch a specific, contemporaneous objection to evidence introduced at trial, the issue is waived for appellate review. *See* Pa.R.E. 103(a); *Commonwealth v. Nabried*, 327 A.3d 315, 325 n.4 (Pa. Super. 2024).

Our review of the record confirms that counsel for Bradsher failed to object to the introduction of Officer Shapter's bodycam footage when the court

_____

[6] Our federal and state constitutions guarantee a criminal defendant's right "to be confronted with the witnesses against him[.]" U.S. Const. amend. VI; Pa. Const. Art. I § 9. Accordingly, the Confrontation Clause "prohibits out-of-court testimonial statements by a witness unless the witness is unavailable and the defendant had a prior opportunity for cross-examination." *Commonwealth v. Yohe*, 79 A.3d 520, 531 (Pa. 2013) (citation and footnote omitted).

heard argument on the Commonwealth's motion *in limine*. **See** N.T. Trial, 9/16/24, at 12-18. Although Attorney Clelland, who represented co-defendant Graham, offered a hearsay argument in opposition to the introduction of the footage on behalf of his client, counsel for Bradsher made no attempt at that time to join his argument or independently offer an argument on Bradsher's behalf. When the evidence was subsequently presented at trial, counsel for Bradsher noted that while the defense stipulated to the admission of the evidence, it was "with the understanding that... we continue our objections that were raised previous to." **Id.** at 36.

However, even if we were to construe this attempt by counsel for Bradsher to join Attorney Clelland's earlier hearsay objection liberally, we cannot conclude that this properly preserved the specific Confrontation Clause argument Bradsher raises on appeal. **See Nabried**, 327 A.3d at 325 n.4. Specifically, neither counsel for Bradsher nor Attorney Clelland contended that the bodycam footage presented testimonial statements rendered by *unavailable* witnesses. **See Yohe**, 79 A.3d at 531. Rather, Attorney Clelland appeared to believe that Justine Williams would testify as a witness to the events depicted in the footage at trial, and therefore, he argued that the Commonwealth could not introduce the out-of-court statements where the proponent of the statements was appearing to testify. **See** N.T. Trial, 9/16/24, at 13-14, 16-17. Counsel for Bradsher's first opportunity to object on the basis of the Confrontation Clause was when it became apparent that Justine

Williams was not going to testify at trial. *See id.* at 65. However, no objection was presented to the trial court.

Therefore, we conclude that Bradsher has waived his Confrontation Clause challenge for our review by failing to properly preserve the specific argument before the trial court. Accordingly, Bradsher is not entitled to relief on his second issue.

In his third issue, Bradsher challenges the trial court's denial of his post-sentence motion seeking a new trial based on the weight of the evidence.

> Our standard of review in addressing weight of the evidence claims is whether the trial court has exercised an abuse of discretion by overriding or misapplying the law or rendering a judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the evidence of record. Appellate review of a weight claim is a review of the exercise of discretion, not the underlying question of whether the verdict is against the weight of the evidence. Where the record adequately supports the trial court, the trial court has acted within the limits of its discretion.
>
> Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is or is not against the weight of the evidence. Accordingly, for an appellant to prevail on a challenge to the weight of the evidence, the evidence must be so tenuous, vague, and uncertain that the verdict shocks the conscience of the court.

*Commonwealth v. Williamson*, 330 A.3d 407, 419 (Pa. Super. 2025) (quotation marks and citations omitted). Moreover, "a new trial should not be granted because of a mere conflict in testimony." *Holt*, 273 A.3d at 533 (brackets and citation omitted).

Bradsher avers the court's verdict shocks one's sense of justice because "the identification of the suspects depended entirely on the information provided by the complainants" and "the complainants denied outright in a sworn statement [t]hat [Bradsher]—a man known to [Dion] Williams—participated in the crime or resembled the perpetrator[.]" Appellant's Brief, at 22.

> The trial court addressed Bradsher's weight challenge as follows:

> This was a non-jury trial. As the court observed after all the evidence was in and both the Commonwealth and the [defense] had rested their cases and given short summations: The location of the Dodge Challenger vehicle as it related to the location of the robbery; the Dodge car keys that operated the Dodge Challenger being found on [Bradsher]; the locations of [Bradsher and Graham] when they were found and apprehended as those locations were near the scene of the robbery, all being within walking or running distance of each other; and [Graham] having fled as soon as he was approached by Millcreek Police in a patrol car as showing conscious of guilt – taken together with all of the circumstantial evidence indicates overwhelmingly that [ Bradsher ] is guilty of the robbery and conspiracy. There was no abuse of discretion by the court, palpable or otherwise, and [ Bradsher] received a fair trial.

Trial Court Opinion, 4/11/25, at 12-13 (unnecessary capitalization and quotation marks omitted). We discern no abuse of discretion.

Essentially, Bradsher disputes the weight that the trial court, as fact-finder, accorded to the testimony of victim Dion Williams and the sworn statement signed by both Dion and Justine Williams which denied that Bradsher or Graham were the perpetrators of the robbery. However, prior to rendering its verdict, the trial court specifically found that Dion Williams was

not a credible witness, *see* N.T. Trial, 9/16/24, at 123, and our deferential standard of review requires that we afford such a finding "the gravest consideration." *Williamson*, 330 A.3d at 419. While we acknowledge that the evidence presented by the Commonwealth was circumstantial, it was not "so tenuous, vague, and uncertain that the verdict shocks" one's sense of justice. *See id.*

Therefore, we conclude that the trial court did not abuse its discretion in determining that Bradsher's conspiracy and robbery convictions were not against the weight of the evidence. Accordingly, Bradsher is not entitled to relief on his third issue.

For the foregoing reasons, Bradsher's challenges fail, and we affirm his judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

*Benjamin D. Kohler*

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 12/1/2025