J-S09008-22

2022 PA Super 96

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| THEODORE B. DIXON | : | |
| | : | |
| Appellant | : | No. 1072 EDA 2021 |

Appeal from the Judgment of Sentence Entered April 15, 2021
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0001420-2020

BEFORE: LAZARUS, J., KUNSELMAN, J., and STEVENS, P.J.E.[*]

OPINION BY LAZARUS, J.:                          **FILED MAY 26, 2022**

Theodore B. Dixon appeals from the judgment of sentence, entered in the Court of Common Pleas of Philadelphia County, following his conviction by a jury of second-degree murder,[1] conspiracy to commit murder[2] and robbery.[3] After careful review, we affirm.

The relevant facts and procedural history are as follows: On June 30, 2019, at approximately 2:30 a.m., Tianna Valentine-Eatman, Bruce Hall, Diamond Ward (Valentine-Eatman's sister), Michael Hall (Bruce Hall's brother), and Phillip Drumgoole (Bruce Hall's friend) left the Picadilly Club on

_____

[*] Former Justice specially assigned to the Superior Court.

[1] 18 Pa.C.S.§ 2502(b).

[2] 18 Pa.C.S. § 903.

[3] 18 Pa.C.S. § 3701(a)(1)(i).

30th Street in Philadelphia, and walked to their cars, which were parked nearby on Clearfield Street. While the group was standing by their cars, Ward observed a Mercury Grand Marquis pass by multiple times. The car eventually stopped in front of the group. A man stepped out of the car with a gun, pointed the gun at Hall, and shot Hall in the neck. Immediately after, another individual exited the car and began shooting. The driver never exited the car. Valentine-Eatman was shot in the head, and likely died almost instantly. Hall suffered additional shots to the back and arm and ran away from the scene into a nearby alleyway. The shooters then got back into their car and drove away. Drumgoole eventually found Hall and drove him to the hospital, where he made a full recovery.

When the police arrived at the scene, they found six fired cartridge casings that were fired from a 0.9mm Luger. The police could not find Valentine-Eatman's bag, which contained her passport, cash, business phone, and personal phone.

After Valentine-Eatman's death, Valentine-Eatman's mother, Tamika Valentine, accessed Valentine-Eatmen's iCloud account. This revealed that Valentine-Eatman's personal phone was active in the Abbotsford Projects. The police executed a search warrant and found the phone in the possession of Shaquille Sistrunk. The account also revealed that Valentine-Eatman's business phone was used to make a call after the shooting. The police determined that this call was made to a phone number registered to Ernestine Dixon, Theodore Dixon's grandmother. Cell-site analysis revealed that, less

than twenty minutes before the shooting, the phone number associated with Ernestine Dixon connected with a cell phone tower approximately three-tenths of a mile from the crime scene.

In August of 2019, Tamika Valentine discovered that, after Valentine-Eatman's death, $700 was transferred to a Cash App[4] account from Valentine-Eatman's bank account. The name on the Cash App account was "Bashir," which is Dixon's middle name. The police determined that the "identity verification name" linked to the Cash App account was Theodore Dixon. The Cash App account was also linked to the phone number associated with Ernestine Dixon and the email account bashirdixon@gmail.com.

The Police acquired street security footage, which showed a tan-colored Mercury Grand Marquis drive by the scene of the crime multiple times before the shooting. The police conducted a database search and found a Grand Marquis that was originally owned by Shaquille Sistrunk. However, at some point before the shooting, Sistrunk transferred ownership of the vehicle to Dixon.

Dixon was subsequently arrested. He later gave a statement to the police, stating that Valentine-Eatman gave him $700 via Cash App in exchange for marijuana. However, he had no explanation for how the transaction could have occurred after Valentine-Eatman's death.

---

[4] "Cash App is a mobile payment service that allows users to transfer money to one another using a mobile phone app." Brief for Appellee, at 5 n.1.

On November 4, 2020, prior to his jury trial, Dixon filed a motion to quash all charges. Specifically, Dixon claimed that Commonwealth did not make out a *prima facie* case as to any of the charges during the preliminary hearing held on February 18, 2020. On December 4, 2020, the trial court denied Dixon's motion to quash all charges.

On April 13, 2021, following jury selection, Dixon presented an oral motion to relax the facial mask mandate for the witnesses and counsel at trial. N.T. Trial, 4/13/21, at 5. Specifically, Dixon argued that masks would impede the jurors' ability to observe the witnesses' facial expressions and movements on the stand, and, thus, the jurors would be unable to evaluate the credibility of the witnesses. *Id.* At 5-6. At this time, "the Pennsylvania courts were operating under a statewide judicial emergency occasioned by the coronavirus Covid-19 pandemic." Trial Court Opinion, 7/26/21, at 14; *see In re Statewide Judicial Emergency*, 228 A 3d 1281 (Pa. 2020) (*per curiam* order). "As a result, the [trial c]ourt advised counsel that[,] pursuant to safety protocols then in effect, all persons in the courtroom would be required to wear a mask covering their nose and mouth." Trial Court Opinion, 7/26/21, at 14-15; *see* N.T. 4/13/21 at 10-12.

After the Commonwealth rested its case-in-chief, Dixon's counsel presented an oral motion for a directed verdict, which the trial court denied. On April 15, 2021, the jury convicted Dixon of the above-mentioned offenses

(victim: Tianna Valentine-Eatman).[5] At a separate docket number, CP-51-CR-0001421-2020, Dixon was also convicted of attempted murder, 18 Pa.C.S.A. § 901(a), conspiracy to commit murder, and robbery, (victim: Bruce Hall).[6] The trial court imposed the mandatory sentence of life in prison for second-degree murder. The court imposed no further penalty on the robbery and conspiracy to commit murder charges.[7]

On April 26, 2021, Dixon filed a post-sentence miscellaneous motion for judgment notwithstanding the verdict and for judgment against the weight of the evidence. On April 30, 2021, the motion was denied by the trial court.

Dixon filed a timely notice of appeal, followed by a court-ordered Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. Dixon raises the following claims for our review:

> 1. Did the trial court err as a matter of law when it denied the motion for a judgment of acquittal on all charges filed by defense counsel, prior to trial, on November 4, 2020?
>
> 2. Did the trial court err when it denied the motion for directed verdict on the murder and/or conspiracy charges verbally requested by defense counsel?
>
> 3. Did the trial court err as a matter of law when it denied all post[-]sentence motions including the weight of the evidence at trial being insufficient to render a conviction and as to the

---

[5] Dixon was found not guilty of first-degree murder, 18 Pa.C.S.A. § 2502(a).

[6] Dixon filed a separate appeal with regard to his convictions at docket number CP-51-CR-0001421-2020, which was ultimately dismissed for failure to file a brief. **See** Order, 10/1/21 (1074 EDA 2021).

[7] Dixon's conviction for robbery, which was the predicate felony for second-degree murder, merged with the latter conviction for purposes of sentencing.

evidence of the remaining charges relating to a judgment *non obstante veredicto*?

4. Did the trial court err as a matter of law when it denied [Dixon's] pre[-]trial motion to allow counsel and the witness who[] is currently testifying to lower their mask while giving testimony and[,] thus[,] limited the jury in assessing credibility and truthfulness to the which directly resulted in unfair prejudice suffered against [Dixon] within the mean[ing] of the Sixth Amendment of the United States Constitution?

Brief of Appellant, at 6.

Dixon first claims that, at the preliminary hearing, the Commonwealth failed to make out a *prima facie* case as to the charges against him, and, therefore, the trial court erred as a matter of law when it denied his motion to quash all charges prior to the trial commencing. Brief for Appellant, at 12. Dixon is entitled to no relief.

"[I]t is well settled that when, at trial, the Commonwealth proves the offense beyond a reasonable doubt, any defects at a preliminary hearing regarding the sufficiency of the evidence are considered harmless." ***Commonwealth v. Wilson***, 172 A.3d 605, 610 (Pa. Super. 2017) (citations and internal quotation marks omitted). "Indeed, once a defendant has gone to trial and has been found guilty of the crime or crimes charged, any defect in the preliminary hearing is rendered immaterial." ***Commonwealth v. Sanchez***, 82 A.3d 943, 984 (Pa. 2013).

Because Dixon was convicted beyond a reasonable doubt—convictions which we affirm—he cannot now challenge the trial court's pre-trial denial of his claim that the Commonwealth had failed to present a *prima facie* case. ***Wilson, supra***.

- 6 -

In his second issue on appeal, Dixon claims that the trial court erred in denying his oral motion for a directed verdict on the murder and conspiracy charges because the Commonwealth did not present sufficient evidence to find him guilty beyond a reasonable doubt. Brief for Appellant, at 12. We agree with the trial court's decision to deny Dixon's motion for directed verdict.

The standard of review in assessing whether sufficient evidence was presented to sustain an appellant's conviction is as follows:

> The standard we apply in reviewing the sufficiency of the evidence is whether[,] viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying [this] test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that[,] as a matter of law[,] no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact[,] while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part[,] or none of the evidence.

*Commonwealth v. Walsh*, 36 A.3d 613, 618-19 (Pa. Super. 2012), quoting *Commonwealth v. Brumbaugh*, 932 A.2d 108, 109-10 (Pa. Super. 2007).

"A criminal homicide constitutes murder of the second degree when it is committed while defendant was engaged as a principal or an accomplice in

the perpetration of a felony." ***Commonwealth v. Knox***, 50 A.3d 749, 754 (Pa. Super. 2012). "'Perpetration of a felony' is defined as: 'The act of the defendant in engaging in or being an accomplice in the commission of, or an attempt to commit, or flight after committing, or attempting to commit robbery, rape, or deviate sexual intercourse by force or threat of force, arson, burglary[,] or kidnapping.'" ***Id.*** at 754-55, quoting 18 Pa.C.S.A. § 2502(d). "The malice or intent to commit the underlying crime is imputed to the killing to make it second-degree murder, regardless of whether the defendant actually intended to physically harm the victim." ***Commonwealth v. Rivera***, 238 A.3d 482, 500 (Pa. Super. 2020).

Instantly, the felony underlying Dixon's second-degree murder charge was robbery. "A person is guilty of robbery if, in the course of committing a theft, he [*inter alia*]: . . . inflicts serious bodily injury upon another." 18 Pa.C.S.A. § 3701(a)(1)(i). "An act shall be deemed 'in the course of committing a theft' if it occurs in an attempt to commit theft or in flight after the attempt or commission." ***Id.*** at § 3701(a)(2).

"A person is guilty of conspiracy with another person or persons to commit a crime if[,] with the intent of promoting or facilitating its commission[,] he: (1) agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime; or (2) agrees to aid such other person or persons in the planning or commission of such crime or of an attempt or solicitation to commit such crime." ***Id.*** at § 903(a). "'[M]ere

- 8 -

association with the perpetrators, mere presence at the scene, or mere knowledge of the crime is insufficient' to establish that a defendant was part of a conspiratorial agreement to commit the crime." ***Commonwealth v. Murphy***, 844 A.2d 1228, 1238 (Pa. 2004), quoting ***Commonwealth v. Lambert***, 795 A.2d 1010, 1016 (Pa. Super. 2002). "[T]he defendant's intent[,] as well as the agreement[,] is almost always proven through circumstantial evidence, such as by 'the relations, conduct or circumstances of the parties or overt acts on the part of the co-conspirators.'" ***Id.***, quoting ***Commonwealth v. Spotz***, 716 A.2d 580, 592 (Pa. 1998). "Once the trier of fact finds that there was an agreement and the defendant intentionally entered into the agreement, that defendant may be liable for the overt acts committed in furtherance of the conspiracy[,] regardless of which co-conspirator committed the act." ***Id.***, citing ***Commonwealth v. Wayne***, 720 A.2d 456, 463-64 (Pa. 1998).

Here, the Commonwealth presented sufficient evidence for the jury to conclude that Dixon committed the offenses of robbery and second-degree murder. The Commonwealth's evidence shows that Dixon was a principal or an accomplice in the commission of the robbery of Valentine-Eatman. After Valentine-Eatman and Hall were shot by the two individuals riding in a Mercury Grand Marquis, Valentine-Eatman's passport, cash, business phone, and personal phone, were found missing from the scene of the crime. N.T. Trial, 4/13/21, at 85-86, 94-95. Her personal phone was found in possession of Sistrunk. ***Id.***, 4/14/21, at 77-78. After the shooting, Valentine-

Eatman's business phone was used to make a call to a phone number registered to Dixon's grandmother. *Id.* at 71-73, 85. That phone number also connected with a cell phone tower about three-tenths of a mile from the scene only twenty minutes before the shooting occurred. *Id.* at 39-40, 85.

Additionally, after Valentine-Eatman's death, $700.00 from Valentine-Eatman's bank account was transferred to a Cash App account with an "identity verification name" of Theodore Dixon. N.T. Trial, 4/13/21, at 260-61, 267; N.T. Trial, 4/14/21, at 82-84, 92, 99-100. The Cash App account was also linked to the phone number associated with Ernestine Dixon and the email account bashirdixon@gmail.com. *Id.* at 82-84. Bashir is Dixon's middle name. N.T. Trial, 4/13/21, at 269-71. Upon questioning by police, Dixon could not explain how Valentine-Eatman could have transferred $700.00 from her bank account to his Cash App account after her death. *See* Commonwealth Exhibit C-87 (video statement of Dixon).

Finally, the shooters were driving a Mercury Grand Marquis back and forth before the shooting, as evidenced by street security footage. N.T. Trial, 4/14/21, at 67. The police discovered that Sistrunk, the man found in possession of Valentine-Eatman's personal phone after the shooting, owned a Mercury Grand Marquis. *Id.* at 73-77. Sistrunk had transferred to Dixon the ownership of this vehicle, which was registered to Dixon two days before the shooting. *Id.*

- 10 -

Moreover, because Valentine-Eatman suffered a fatal gunshot wound during the commission of the robbery, the evidence is sufficient to sustain Dixon's second-degree murder conviction. **Knox**, **supra**.

The Commonwealth also presented sufficient evidence for the jury to conclude that Dixon committed the offense of conspiracy to commit murder. The circumstantial evidence establishes that Dixon was one of at least three individuals who intended and agreed to promote or facilitate the robbery and shooting of Valentine-Eatman. First, Dixon owned a Mercury Grand Marquis, the same type of car operated by the shooters and robbers at the scene of the crime. Second, Valentine-Eatman's business phone, which was missing from the scene of the crime after the two shooters left, was used to call the number registered to Dixon's grandmother after Valentine-Eatman's death. Third, the number registered to Dixon's grandmother hit off a cell phone tower three-tenths of a mile away from the scene of the crime only twenty minutes before the shooting. Fourth, Dixon could not explain how his Cash App account received money transfers from Valentine-Eatman's bank account after she was robbed and killed. Lastly, Dixon knew Sistrunk, who was found in possession of Valentine-Eatman's personal phone and who had recently transferred ownership of a Mercury Grand Marquis to Dixon.

Dixon next claims that the trial court "erred in denying his post sentence motion for judgment of acquittal because the weight of the evidence at trial was insufficient to support his conviction." Brief for Appellant, at 16. He is entitled to no relief.

"A motion for judgment of acquittal challenges the sufficiency of the evidence to sustain a conviction on a particular charge, and is granted only in cases in which the Commonwealth has failed to carry its burden regarding that charge." *Commonwealth v. Foster*, 33 A.3d 632, 635 (Pa. Super. 2011) (citation omitted). As we have already concluded that the evidence was sufficient to support Dixons' convictions, we need address this specific claim no further.

Dixon also asserts that the verdict was against the weight of the evidence. Our standard of review for such claims is as follows:

> The weight of the evidence is exclusively for the finder of fact who is free to believe all, part, or none of the evidence and to determine the credibility of the witness. An appellate court cannot substitute its judgment for that of the finder of fact. Thus, we may only reverse the [trial] court's verdict if it is so contrary to the evidence as to shock one's sense of justice. Moreover, where the trial court has ruled on the weight claim below, an appellate court's role is not to consider the underlying question of whether the verdict is against the weight of the evidence. Rather, appellate review is limited to whether the trial court palpably abused its discretion in ruling on the weight claim.

*Commonwealth v. Collins*, 70 A.3d 1245, 1251 (Pa. Super. 2013) (quoting *Commonwealth v. Champney*, 832 A.2d 403, 408 (Pa. 2003)).

Dixon argues that the evidence adduced at trial does not prove that Dixon was involved in the second-degree murder and robbery of Valentine-Eatman, but instead points to Sistrunk as the perpetrator. Brief for Appellant, at 17. Dixon claims he was never seen with the murder weapon, there was no fingerprint or DNA evidence tying him to the crimes charged, the vehicle

driven by the shooters at the scene of the crime was not connected to a specific owner, he was not arrested at the scene of the crime, and there were no witnesses that could identify him at the scene of the crime. ***Id.*** Dixon claims the evidence points to Sistrunk as the perpetrator, because Sistrunk "authored lyrics on [Valentine-Eatman's] [personal] phone after he committed homicide against her, [] took the decedent's phone to record rap lyrics, [] operated the Mercury Grand Marquis, and [] was arrested in possession of the decedent's phone." ***Id.***

The trial court addressed Dixon's weight claim as follows:

[Dixon's] grounds for his post-sentence motion suggest that there was only weak circumstantial evidence linking [him] to these charges, and that the evidence actually pointed to Shaquille Sistrunk as the perpetrator. These claims are without merit.

[Dixon] is correct in his assertion that [] Sistrunk was found with one of [] Valentine-Eatman's phones after her murder. However, that evidence does not exculpate [Dixon]. The evidence presented at trial established that at least three individuals were involved in the robbery and shooting, including a driver and two shooters. The fact that [] Sistrunk was found with one of the [victim's] phones merely illustrates that he may have been one of the co-conspirators who conspired with [Dixon] in the commission of these crimes.

As described above, the Commonwealth presented compelling evidence of [Dixon's] guilt. This evidence plainly established that defendant committed the crimes of which he was convicted. Because the evidence fully supported the verdict, the [c]ourt did not abuse its discretion in denying [Dixon's] weight claims. No relief is due.

Trial Court Opinion, 7/26/21, at 14.

Upon review of the record, we can discern no abuse of discretion by the trial court in rejecting Dixon's weight claim. ***Collins***, ***supra***.

Lastly, Dixon claims that "the trial court violated [his] Sixth Amendment right to confrontation when it refused to modify COVID-19 procedures consistent with surrounding jurisdictions." Brief for Appellant, at 17. Dixon argues that "the jury could not assess the witnesses['] credibility by observing their behavior because the witnesses were prohibited from temporarily lowering their masks while giving testimony[,] even though the witnesses were more than six feet away from others and guarded by plexiglass." *Id.* at 18. He is entitled to no relief.

The federal confrontation clause guarantees an accused the right "to be confronted with the witnesses against him." U.S. Cont. Amend. VI. Article I, section 9 of the Pennsylvania Constitution uses identical language. The United States Supreme Court has described the purpose of the confrontation clause as follows:

> The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact. The word "confront," after all, also means a clashing of forces or ideas, thus carrying with it the notion of adversariness. As we noted in our earliest case interpreting the Clause:
>
> > "The primary object of the constitutional provision in question was to prevent depositions or *ex parte* affidavits, such as were sometimes admitted in civil cases, being used against the prisoner in lieu of a personal examination and cross-examination of the witness in which the accused has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is

worthy of belief." ***Mattox*** [***v. United States***, 156 U.S. 237, 242–243[] (1895)].

As this description indicates, the right guaranteed by the Confrontation Clause includes not only a "personal examination," [***id.***] at 242 [], but also "(1) insures that the witness will give his statements under oath—thus impressing him with the seriousness of the matter and guarding against the lie by the possibility of a penalty for perjury; (2) forces the witness to submit to cross-examination, the 'greatest legal engine ever invented for the discovery of truth'; [and] (3) permits the jury that is to decide the defendant's fate to observe the demeanor of the witness in making his statement, thus aiding the jury in assessing his credibility." [***California v.***] ***Green***, [399 U.S. 149, 158[] (1970)] (footnote omitted).

The combined effect of these elements of confrontation—physical presence, oath, cross-examination, and observation of demeanor by the trier of fact—serves the purposes of the Confrontation Clause by ensuring that evidence admitted against an accused is reliable and subject to the rigorous adversarial testing that is the norm of Anglo–American criminal proceedings.

***Commonwealth v. Atkinson***, 987 A.2d 743, 746 (Pa. Super. 2009), quoting

***Maryland v. Craig***, 497 U.S. 836, 845–46 (1990).

"[T]he Confrontation Clause reflects a preference for face-to-face confrontation at trial[.]" ***Craig***, 497 U.S. at 849. However, that preference "must occasionally give way to considerations of public policy and the necessities of the case[.]" ***Id.***

We have been unable to find any Pennsylvania case—published or unpublished—addressing this specific issue in the context of COVID-19 masking requirements.[8] However, in ***Commonwealth v. Smarr***, 1179 WDA

---

[8] A similar claim was raised in ***Commonwealth v. Padilla***, 270 A.3d 1143 (Pa. Super. 2021) (Table), an unpublished memorandum decision. However, in that case, a majority of the panel concluded that the appellant had waived the claim and, therefore, did not address its merits.

2018 (Pa. Super. July 3, 2019) (unpublished memorandum decision),[9] a pre-pandemic unpublished decision, this Court addressed a confrontation clause issue that arose when the court permitted a female witness to wear a religious face-covering while testifying. The appellant's argument was two-fold: First, the witness testified she only wears the scarf on Fridays, when she attends religious services, and whenever she feels that she wants to. However, she did not testify her religion required her to wear the scarf while testifying. Therefore, appellant argued, it was unnecessary to allow her to do so. Second, the appellant argued that the reliability of the witness' testimony was not otherwise assured, as the members of the jury were unable to clearly see her facial expressions and, thus, fully assess her demeanor and credibility. This Court denied relief, concluding that:

> Smarr has failed to establish that he was denied a physical, face-to-face confrontation with [the witness]. Smarr and [the witness] were in the same room, sitting within a few feet of each other, when [the witness] testified. In addition, [the witness'] eyes were unobstructed. No precedent has established that a witness's clothing or accessories renders a physical, in-court confrontation other than face-to-face, particularly where the clothing does not

---

[9] Pursuant to Pa.R.A.P. 126(b):

> (1) As used in this rule, "non-precedential decision" refers to an unpublished non-precedential memorandum decision of the Superior Court filed after May 1, 2019[.]

> (2) Non-precedential decisions as defined in (b)(1) may be cited for their persuasive value.

Pa.R.A.P. 126(b).

obstruct the witness's eyes, and we decline to do so under the facts of this case. We[,] therefore[,] hold that Smarr's right to be brought face-to-face with his accuser was satisfied.

*Smarr*, 1179 WDA 2018, at *6.

We find the reasoning in *Smarr* persuasive here. The COVID-19 pandemic presented an unprecedented challenge to the judicial system, which found itself balancing defendants' rights to speedy trials with serious public health concerns. In response to the pandemic, our Supreme Court declared a statewide judicial emergency, authorizing the courts of the Commonwealth "to consider—on a district-by-district basis—the appropriate measures to be taken to safeguard the health and safety of court personnel, court users, and members of the public." *In re Gen. Statewide Judicial Emergency*, *supra*.

Instantly, the trial court applied the safety protocols then in effect and declined to require witnesses to remove their masks while testifying, reasoning as follows:

> THE COURT: Okay. Well, first of all, this requires a weighing. I think it's a confrontation clause issue. There are Supreme Court cases that deal with this, and if we're going to interfere at all with the right to be looking at the witness, to the extent that that has something to do with confrontation, that has to be weighed against other compelling factors. We are in a room with—this is the Criminal Justice Center. There is no ventilation that—any of the windows are open. The HVAC system is ancient and nothing close to what is safe. Plexiglass does not stop any airborne viruses from reaching over through the glass, and that's why the court came up with this practice. And again, if this had been raised pretrial, I would have listened and perhaps considered giving it a date, but it seems to me if this isn't compelling necessity for this kind of a restriction, I don't know what would be.

N.T. Trial, 4/13/21, at 7-8.

- 17 -

Here, the witnesses testified, under oath, within feet of Dixon and the jury. The jury was able to assess the witnesses' credibility and demeanor by (1) observing their movements, body language, appearance, eyes, and posture; and (2) listening to the tone of their voices. Most importantly, the witnesses were subject to cross-examination by defense counsel. In light of the foregoing—and bearing in mind the necessity of protecting trial participants and members of the general public during an unprecedented public health emergency—we conclude that Dixon was not denied his Sixth Amendment right to a physical, face-to-face confrontation with the Commonwealth's witnesses. *Craig*, 497 U.S. at 849 (preference for face-to-face confrontation must occasionally give way to considerations of public policy and the necessities of the case).

Judgment of sentence affirmed.

*Judgment Entered.*

*Joseph D. Seletyn, Esq.*
*Prothonotary*

*Date: 5/26/2022*