J-S37007-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JACOB HOLMES, JR. | : | |
| | : | |
| Appellant | : | No. 2055 EDA 2021 |

Appeal from the Judgment of Sentence Entered April 27, 2021
In the Court of Common Pleas of Northampton County Criminal Division
at No(s): CP-48-CR-0003514-2017

BEFORE: BOWES, J., LAZARUS, J., and OLSON, J.

MEMORANDUM BY BOWES, J.: **FILED APRIL 25, 2023**

Jacob Holmes, Jr. appeals from the April 27, 2021 judgment of sentence which imposed a sentence of life imprisonment without the possibility of parole and a consecutive fifteen to thirty years of incarceration, stemming from his convictions for first-degree murder and criminal conspiracy to commit first-degree murder. We affirm.

On the evening of March 30, 2009, Easton police responded to a report of a shooting at the Easton Cafe. Upon arrival, the police found Miguel Aponte ("the victim") laying on the floor of the bar, deceased. A forensic pathologist determined that the victim's cause of death was multiple gunshot wounds and that the manner of death was homicide. Witnesses on scene recalled seeing Franklin Barndt, a white male, twice entering the bar, looking around, and leaving, shortly before the shooting. *See* N.T. Jury Trial Vol VIII, 12/9/20, at 45-47, 51-52; *see also* N.T. Jury Trial Vol X, 12/11/20, at 29. Moments after

Barndt's second exit someone knocked on the locked back door near where the victim was seated. *See* N.T. Jury Trial Vol VII, 12/8/20, at 146-47. The bartender opened the door to find a light-skinned black man with a face mask and a gun who immediately opened fire on the victim. *Id*. at 148. The victim was shot seven times at close range. No other patrons were injured before the shooter fled the area.

While Barndt's skin color meant that he was not the shooter, Barndt's suspicious behavior led officers to believe he was associated with the shooter. *Id*. at 196-97 (four eyewitnesses describing the shooter as a black male wearing a face covering). In addition to witnesses identifying Barndt, his cell phone records placed him in the area of the Easton Cafe before and during the shooting. *See* N.T. Jury Trial Vol X, 12/11/20, at 34, 40-41, 46. Barndt admitted he was at the Easton Cafe that night, but initially claimed that he left the area forty-five minutes before the shooting and walked to the Brick House Tavern, which was several miles away. *See* N.T. Jury Trial Vol VIII, 12/9/20, at 206. Barndt's paramour Raquel Meyer confirmed Barndt's movements, explaining that she had picked Barndt up from the Brick House Tavern. *See* N.T. Jury Trial Vol IX, 12/10/20, at 39.

However, months later, Meyer provided a second, more detailed statement, explaining that Barndt had summoned her to the Brick House Tavern to pick him up, instructed her to come alone, and that Appellant had entered the vehicle with Barndt. *See* N.T. Jury Trial Vol IX, 12/10/20, at 27-29. Both men were "hyped up" and she overheard Barndt trying to convince

Appellant of her trustworthiness. *Id*. at 31-32. The next morning Meyer drove Barndt to a nearby park and watched as he threw a firearm into the Delaware River. *Id*. at 33-35. Alarmed by this development, Meyer questioned Barndt about the firearm, but he told her to "mind [her] business." *Id*. After the second interview, Meyer moved to Puerto Rico, "fearing what could happen from this." N.T. Jury Trial Vol X, 12/11/20, at 69. Meyer's cell phone records confirmed that she was at home when the homicide occurred. *Id*. at 70. A recovery service searched the river, but the firearm was never found. *Id*. at 67-68.

Meanwhile, officers discovered that in 2006 Appellant was shot and wounded when his best friend, Jason Oliver, was shot to death by John Logan, an associate of the victim. Appellant initially told officers at the hospital that he did not know who the shooter was, but that "he would recognize him, and if he sees him he'll get him." N.T. Jury Trial Vol VII, 12/8/20, at 86. Later, Appellant identified Logan as the shooter and the victim as his associate. *Id*. at 108. Logan was arrested and pled guilty to homicide, receiving a sentence of twenty to forty years of incarceration. *Id*. at 109. The victim was also arrested and charged with criminal homicide. However, after Appellant testified at the victim's preliminary hearing, the victim pled guilty to carrying a firearm without a license and received a sentence of two and one-half to five years of incarceration. *Id*. at 111-12, 124-26. On December 31, 2008, the victim was released from incarceration. *See* N.T. Jury Trial Vol VIII, 12/9/20, at 67. He was killed less than ninety days later.

In 2010, Appellant agreed to speak with police about the Easton Cafe, but denied involvement, claiming he was "home all night." N.T. Jury Trial Vol X, 12/11/20, at 77-78. Appellant admitted that he knew Barndt but denied calling or hanging out with him the night of the Easton Cafe homicide. *Id*. at 78. However, Appellant's phone records contradicted his statements, revealing that he had exchanged several calls with Barndt before and after the shooting, was in the vicinity of the Easton Cafe at the time of the shooting, and moved in concert with Barndt in its immediate aftermath. *Id*. at 165-95, 210.

Due to difficulties in obtaining witness cooperation, the district attorney's office convened three separate investigating grand juries pertaining to the Easton Cafe homicide. *See* N.T. Jury Trial Vol X, 12/11/20, at 30-31, 56. When Barndt heard that Meyer was returning from Puerto Rico to testify at the grand jury proceeding, he absconded from his boot camp assignment at Rockview State Prison, where he was serving time on an unrelated conviction. Barndt was captured a couple hours later, returned to prison, and charged with escape. Meyer testified before the grand jury consistently with the statement she made during her second interview. Barndt also testified before the grand jury, for the first time identifying Appellant as the shooter, but denying any involvement in the shooting. *See* N.T. Jury Trial Vol VIII, 12/9/20, at 233; *see also* N.T. Jury Trial Vol X, 12/11/20, at 57-58. During his testimony before the second grand jury, Barndt admitted that he entered the vehicle with Appellant after the shooting.

Meanwhile, on April 30, 2012, Megan Fenar, Appellant's former paramour, went to the Easton Police Department to make a report in an unrelated matter. *See* N.T. Jury Trial Vol IX, 12/10/20, at 136. While there, Fenar informed police that she had information about a murder and revealed that Appellant admitted to her that he killed the victim. *Id*. at 138-39. Appellant had also told Fenar that his friend Barndt was there and that a woman had acted as their driver. *Id*. at 152-53. Appellant expressed confidence that he would get away with the homicide because the woman had moved to Puerto Rico. *Id*.

In December of 2013, Barndt was arrested and pled guilty to conspiracy to commit murder with Appellant and related charges for the death of the victim. The same day, Barndt also pled guilty to terroristic threats due to threats he had made to kill law enforcement officers involved in the investigation of this shooting. Barndt was sentenced to an aggregate sixteen to forty-two years of incarceration for his role in the victim's homicide.

On March 15, 2016, Barndt requested a meeting with law enforcement through his attorney. *See* N.T. Jury Trial Vol VIII, 12/9/20, at 212. During the meeting, Barndt revealed for the first time the full extent of his involvement in the homicide. Barndt explained that he received multiple calls from Appellant on the evening of March 30, 2009, during which they discussed the victim's presence at the Easton Cafe. After Appellant repeatedly stated that he wanted to kill the victim and Barndt confirmed his location in the bar, the two met up in a parking lot near the Easton Cafe, exchanging clothing and

a firearm. Together they approached the side door to Easton Cafe before Appellant entered the bar and repeatedly fired at the victim while Barndt remained outside. Afterwards, Appellant returned the firearm to Barndt and they fled to the Brick House Tavern together in Appellant's vehicle. Barndt admitted to driving the getaway vehicle and took officers to the location where he disposed of the firearm the next day, matching Meyer's earlier description. *See* N.T. Jury Trial Vol X, 12/11/20, at 64.

In August of 2017, Easton police officers arrested Appellant and charged him with criminal homicide, criminal conspiracy to commit criminal homicide, recklessly endangering another person, and carrying a firearm without a license. Thereafter, the Commonwealth filed a notice of intent to seek the death penalty.

In 2018, Appellant filed an omnibus pretrial motion, requesting, among other claims, a change of venue or venire due to pretrial publicity. *See* Omnibus Pretrial Motion, 1/18/18, at 4. After a change of counsel, Appellant filed a supplemental motion raising the same issues. On March 23, 2018, the trial court held a hearing on the pretrial motions. Following the hearing, Appellant filed a second supplemental omnibus pretrial motion, attaching various media articles. On April 11, 2018, the trial court issued an order and opinion. The court included additional media articles that Appellant had not provided, concluded that Appellant's pretrial publicity claims were "overstated," and denied the motion without prejudice. Trial Court Opinion, 4/11/18 at 24. Over the next two years, Appellant and the Commonwealth

continued to litigate various pretrial motions which are not pertinent to this appeal, including the admissibility of the jail house confession Appellant made to the brother of Jason Oliver, the victim from the 2006 shooting.

In December of 2019, a novel coronavirus ("COVID-19") began infecting humans. As of March 16, 2020, the COVID-19 pandemic had spread to the United States, prompting the Pennsylvania Supreme Court to declare a statewide judicial emergency. In its March 16, 2020 declaration and in its subsequent extensions, our Supreme Court authorized the President Judges of each judicial district to likewise declare a judicial emergency within their district, and where in-person appearances were necessary, to employ safety measures "consistent as possible with the federal and state executive guidance associated with countering the spread of the COVID-19 virus." *In Re General Statewide Judicial Emergency*, 228 A.3d 1281 (Pa. 2020) (*per curiam* order). Pursuant to the emergency declaration, all jury trials in the Commonwealth were suspended through June 1, 2020.

On May 11, 2020, the Administrative Office of Pennsylvania Courts ("AOPC") and the Pennsylvania Conference of State Trial Judges created the Jury Trial Working Group ("JTWG") to present recommendations in anticipation of resuming jury trials in the Commonwealth. On June 25, 2020, the JTWG issued a series of recommendations for the resumption of jury trials, including a suggestion that the personnel and members of the public wear clear face shields so that safety concerns could be mitigated while still allowing for the evaluation of facial expressions and demeanor. *See* Appellant's Brief

Exhibit 2 at 8. The JTWG also recommended social distancing jurors in the viewing gallery, rather than the smaller jury box typically reserved for the jury. These safety measures were promulgated by our Supreme Court and instituted throughout the Commonwealth. As a result of the safety measures in place, our Supreme Court reinstituted jury trials in June of 2020.

On September 30, 2020, the trial court held a hearing to discuss the logistics of jury selection amidst COVID-19 safety protocols. Appellant objected to the clear face shield requirement that Northampton County had adopted for jurors, witnesses, and himself. *See* N.T. Hearing, 9/30/20, at 3, 5. Appellant explained that he was concerned that the shields would obscure facial expressions, violating his federal and state confrontation clause rights. *Id*. at 11. Appellant was also distressed about wearing a face shield in front of the jury panel since the shooter wore a t-shirt he had fashioned as a mask. *Id*. at 7. Defense counsel requested a continuance until such time that the Center for Disease Control and Prevention ("CDC") guidelines would allow them to proceed to a maskless trial. *Id*. at 12. The Commonwealth objected to the continuance, explaining that other jury trials had been fairly conducted with the same face shields in Northampton County and that the clear face shield did not resemble the t-shirt that the shooter had worn to obscure his face. *Id*. at 7-8, 13. After Appellant agreed to waive his Rule 600 rights indefinitely, the trial court took the matter under advisement.

On October 6, 2020, the Commonwealth submitted a brief opposing Appellant's request for a continuance, stating the previously raised objections

and explaining that the clear face shields did not obscure any facial expressions. Appellant filed a motion *in limine* reiterating his earlier objections to the COVID-19 safety protocols, acknowledging that these precautions had been utilized in four jury trials already but claiming that they were inadequate for lengthier death penalty trials. Appellant also filed a brief raising an additional challenge to the placement of jurors due to social distancing requirements, which he claimed would place jurors "miles away from the witness box." Defendant's Brief, 10/13/20, at unnumbered 3.

On October 14, 2020, the trial court held a second hearing regarding Appellant's objections to the COVID-19 safety protocols. At this hearing, a court officer demonstrated two clear face shield options, which the trial court described as showing the entire face of the wearer absent one-half-inch area around the bridge of the nose. *See* N.T. Hearing, 10/14/20, at 23-24, 37; *see also* Appellant's brief at Exhibit 1 (containing a picture of the transparent face mask utilized at Appellant's trial). Defense counsel noted Appellant's continuing objection to anyone wearing shields or masks. *Id*. at 29. At the conclusion of the hearing, the court denied Appellant's motion, reasoning that the court had followed all protocols as set forth by the AOPC and agreed upon by the Pennsylvania Supreme Court for jury trials during the pandemic and saw no reason why a death penalty case should be treated differently than other trials that had already taken place in Northampton County. *Id*. at 37.

On October 20, 2020, the trial court held a hearing at which the parties discussed, for a third time, the logistics of holding a trial amidst the COVID-

19 precautions. Specifically, the parties determined that family members of the victim and Appellant would need to watch the proceedings in separate rooms through a live broadcast feed to comply with social distancing requirements. **See** N.T. Hearing, 10/20/20, at 25. The court also approved an instruction explaining the family members' absence from the courtroom to the jurors. Appellant objected to the simulcast plan because "he wanted to be able to look back at his family for support" during the trial. **Id**. at 28. However, after confirming the space restrictions did not allow for any additional people beyond the court staff, parties, and jurors, the court denied the motion. **Id**. at 30.

On November 2, 2020, Appellant's jury trial was continued after one of his defense attorneys suffered multiple direct exposures to individuals who had tested positive for COVID-19. On November 30, 2020, prior to the start of jury selection, defense counsel renewed his request for a continuance, citing concern about the recent uptick in COVID-19 cases in the area. **See** N.T., 11/30/20, at 3-4. The court denied Appellant's continuance request, finding its plan to question the jury pool about recent COVID-19 exposures during its opening instructions and in a supplemental COVID-19 jury questionnaire created by the AOPC and approved by the Supreme Court to be a sufficient response to the recent surge in COVID-19 infections. **Id**. at 13-14. The trial court also noted that it was planning to question jurors about their pre-trial publicity awareness. **Id**.

Jury selection ensued, during which jurors were questioned about COVID-19 exposures and the extent of their awareness of the case through media sources. Only seventeen of the one hundred and fifty-four prospective jurors indicated that they were aware of the case prior to arriving at court. *See* N.T. Jury Trial Vol I, 11/30/20, at 47, 143; N.T. Jury Trial Vol II, 12/1/20, at 19; N.T. Jury Trial Vol VI, 12/7/20, at 223-24. Of those prospective jurors, only one served on the jury, as the fourth alternate, after indicating that she could set aside what she had learned by skimming an article about the case and be fair and impartial. *See* N.T. Jury Trial Vol VI, 12/7/20, at 223-24.

On December 8, 2020, Appellant proceeded to the guilt phase of his death penalty jury trial. At trial, multiple witnesses described the shooter as someone matching Appellant's description, but only Barndt identified Appellant as the shooter and detailed his involvement in the planning and flight from the shooting. *See* N.T. Jury Trial Vol VIII, 12/9/20, at 17-86. Appellant's former paramour also testified that Appellant had bragged about killing the victim, explaining the only way he could "go down for what happened [was] if this woman would come back from Puerto Rico." N.T. Jury Trial Vol IX, 12/10/20, at 133. Finally, Brian Oliver testified that Appellant had approached him in prison on the fourteenth anniversary of his brother's murder, hugged him, and told him that he had "handled my business, I could not let it ride." N.T. Jury Trial Vol XI, 12/14/20, at 25.

On December 15, 2020, the jury convicted Appellant of first-degree murder and criminal conspiracy to commit first-degree murder. Thereafter,

the jury was dismissed following the penalty phase of Appellant's trial because it could not unanimously agree to impose the death penalty. On April 28, 2021, the trial court imposed a sentence of life imprisonment without the possibility of parole for first-degree murder, followed by a consecutive fifteen to thirty years of incarceration for the criminal conspiracy conviction. Appellant filed a timely post-sentence motion and supplemental post-sentence motion, which were denied. This timely appeal followed. Both Appellant and the trial court complied with the mandates of Pa.R.A.P. 1925.

Appellant advances the following issues for our review:

A. Did the trial court abuse its discretion in denying Appellant's November 4, 2020, motion for a continuance, and Appellant's November 30, 2020, motion for a continuance?

B. Did the trial court abuse its discretion in denying Appellant's motion for change of venue/venire?

Appellant's brief at 4.

Appellant's first issue implicates the trial court's denial of Appellant's request for a continuance. The following legal principles are relevant to our review.

The grant or denial of a motion for a continuance is within the sound discretion of the trial court and will be reversed only upon a showing of an abuse of discretion. An abuse of discretion is not merely an error of judgment; rather discretion is abused when the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias, or ill will, as shown by the evidence or the record. Moreover, a bald allegation of an insufficient amount of time to prepare will not provide a basis for reversal of the denial of a continuance motion. An appellant must be able to show specifically in what manner he was unable to prepare for his defense or how he would

- 12 -

have prepared differently had he been given more time. We will not reverse a denial of a motion for continuance in the absence of prejudice.

*Commonwealth v. Antidormi*, 84 A.3d 736, 745-46 (Pa.Super. 2014) (cleaned up).

Appellant alleges masking and social distancing COVID-19 safety precautions interfered with his confrontation rights.[1] *See* Appellant's brief at 12-13. Specifically, Appellant contends that the trial court denied him his right to a face-to-face confrontation under the Confrontation Clauses of the United States Constitution and Article I, § 9 of the Pennsylvania Constitution when it required jurors and witnesses to wear clear face shields, impairing his ability to select jurors and jurors ability to assess witness credibility.[2]

---

[1] In his brief, Appellant alleges that the trial court abused its discretion in denying his November 4, 2020 and November 30, 2020 motions for continuances. As the Commonwealth pointed out in its brief, the certified record reveals no evidence that any motion for continuance was made on November 4, 2020. *See* Commonwealth's Brief at 5 n.1. Therefore, the Commonwealth urges us to find waiver. *Id*. Upon review, we have determined that the substance of Appellant's claims track with the motion he filed on October 13, 2020, which he attempted to revive on November 30, 2020. Accordingly, we decline to find waiver.

[2] The federal confrontation clause guarantees an accused the right "to be confronted with the witnesses against him." U.S. CONST. AMEND. VI. Article I, § 9 of the Pennsylvania Constitution uses identical language.

- 13 -

Appellant also contends that placing members of the public in a separate room to watch the trial through a simulcast violated his right to a public trial.[3, 4]

The trial court found that Appellant's claims were meritless because the court was authorized to hold jury trials at that time and took the steps to ensure that all participants were safe against COVID-19. *Id*. at 72-72 (detailing the extensive precautions in place to ensure the safety of all participants). Additionally, the court found that the safety precautions did not significantly interfere with jury selection, the jury's ability to observe witness demeanor, or access to members of the public. *Id*. We agree with the trial court.

_____

[3] In his brief, Appellant alleges that his right to a public trial was violated because members of the media were forced to watch the trial in a separate room through a simulcast. However, Appellant did not raise a contemporaneous objection to the simulcast on these grounds at trial. Instead, his objection targeted his family's absence because he wanted to be able to look to them for emotional support. *See* N.T. Hearing, 10/20/20, at 28. A defendant's failure to raise a contemporaneous objection at trial waives such a claim on appeal. *See* Pa.R.Crim.P. 302(a). Therefore, this sub-claim is waived, and we cannot address it. However, even if properly preserved, no relief would be due since Appellant has offered no credible explanation as to how the fact that the media watched the proceeding through a live feed to a nearby room prejudiced him.

[4] Appellant also contended that allowing Melvin Bryson to testify through two-way simultaneous audio-visual communication technology violated his confrontation clause rights. However, Appellant did not raise this specific objection at trial. Instead, he objected to the temporary discontinuation of the simulcast to his family so that Bryson could testify full screen before the jury. *See* N.T. Jury Trial Vol. IX, 12/10/20, at 119-20, 121. Accordingly, this sub-claim is also waived. *See* Pa.R.A.P. 302(a).

The United States Supreme Court has addressed the Confrontation Clause as follows:

> The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact. The word "confront," after all, also means a clashing of forces or ideas, thus carrying with it the notion of adversariness. As we noted in our earliest case interpreting the Clause:
>
>> The primary object of the constitutional provision in question was to prevent depositions or *ex parte* affidavits, such as were sometimes admitted in civil cases, being used against the prisoner in lieu of a personal examination and cross-examination of the witness in which the accused has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief.
>
> As this description indicates, the right guaranteed by the Confrontation Clause includes not only a personal examination, but also (1) insures that the witness will give his statements under oath—thus impressing him with the seriousness of the matter and guarding against the lie by the possibility of a penalty for perjury; (2) forces the witness to submit to cross-examination, the greatest legal engine ever invented for the discovery of truth; [and] (3) permits the jury that is to decide the defendant's fate to observe the demeanor of the witness in making his statement, thus aiding the jury in assessing his credibility.
>
> The combined effect of these elements of confrontation—physical presence, oath, cross-examination, and observation of demeanor by the trier of fact—serves the purposes of the Confrontation Clause by ensuring that evidence admitted against an accused is reliable and subject to the rigorous adversarial testing that is the norm of Anglo–American criminal proceedings.

*Commonwealth v. Atkinson*, 987 A.2d 743, 746 (Pa.Super. 2010) (quoting *Maryland v. Craig*, 497 U.S. 836, 845-46 (1990)) (citations and quotation marks omitted). The *Craig* Court concluded that "'the Confrontation Clause reflects a preference for face-to-face confrontation at trial.'" *Id*. at 849 (quoting *Ohio v. Roberts*, 448 U.S. 56, 63 (1980)) (emphasis omitted). However, the *Craig* Court reasoned that the preference for face-to-face confrontation "'must occasionally give way to considerations of public policy and the necessities of the instant case.'" *Id*. (quoting *Mattox v. United States*, 156 U.S. 237, 243 (1895)).

This Court has previously considered the interplay between COVID-19 safety precautions and jury trials and held that requiring jurors and witnesses to wear face masks and using staggered seating does not violate our state or federal confrontation clauses. For example, in *Commonwealth v. Davis*, 273 A.3d 1228 (Pa.Super. 2022), the defendant challenged the court's decision to allow jurors to wear opaque face masks covering their chin to the bridge of their nose, as opposed to clear face shields, and forgo sitting in the jury box for the much larger gallery. However, this Court found no abuse of discretion, noting that a defendant's right to face-to-face contact is not absolute and the record reflected that the trial court's requirements were not arbitrary, but the result of careful consideration of governing safety and health measures promulgated by the AOPC. *Id*. at 1241. Furthermore, we noted that the defendant failed to demonstrate any prejudice, including that the jury

was not fair and impartial because of the social distancing protocols. *Id*. at 1242.

Similarly, in ***Commonwealth v. Dixon***, 276 A.3d 794 (Pa.Super. 2022), the defendant challenged the trial court's mask mandate for witnesses due to COVID-19 concerns from the absence of proper ventilation in the courtroom. *Id*. at 803. Again, we found no abuse of discretion since the record reflected that the trial court had applied the safety protocols then in effect. *Id*. at 805. Additionally, the witnesses were subject to cross-examination within feet of the jury, allowing the jurors to assess the witnesses' credibility and demeanor through the witnesses' movements, body language, appearance, eyes, posture, and the tone of their voices. *Id*.

The record in the instant case reflects that the trial court reasonably examined the COVID-19 safety recommendations provided by the AOPC regarding jury trials and, based thereon, concluded that all participants would wear clear face shields and utilize socially-distanced seating. Accordingly, as in *Davis* and *Dixon*, the trial court's protocols were not arbitrary, but rather, reflected careful consideration of governing safety measures across multiple pre-trial hearings and filings. Further, unlike in *Davis* and *Dixon*, all witnesses and jurors wore clear face shields, thereby allowing jurors to observe witnesses' full facial demeanor absent a small portion of their noses. ***See*** Appellant's brief at Exhibit 1.

Appellant has also failed to demonstrate any prejudice that he suffered because of the social distancing and clear face shield protocols. The shield

and social distancing requirements herein were the least restrictive means necessary to further the important public policy goal of safety amid a global pandemic. The procedures were based upon the best available scientific information and advice from the CDC to protect everyone in the courtroom from infection. Thus, we find that no relief is due on Appellant's first claim.

Next, Appellant alleges that the trial court abused its discretion when it failed to grant his motion for change of venue or venire based on pretrial publicity. In reviewing a trial court's determination of whether pretrial publicity requires a change of venue or venire, we reverse the determination only where it constitutes an abuse of discretion because the trial court "is in the best position to assess the atmosphere of the community and to judge the necessity of the requested change." *See Commonwealth v. Walter*, 119 A.3d 255, 199-200 (Pa. 2015).

Normally, one who claims that he has been denied a fair trial because of pretrial publicity must show actual prejudice in the empaneling of the jury. *See* Pa.R.Crim.P. 584(A). In certain cases, however, pretrial publicity can be so pervasive or inflammatory that the defendant need not prove actual juror prejudice. Prejudice is presumed if the pretrial publicity's content is "sensational, inflammatory, and slanted toward conviction, rather than factual and objective[;]" "reveal[s] the defendant's prior criminal record, if any[;]" "referred to confessions, admissions or reenactments of the crime by the defendant," or is "derived from official police or prosecutorial reports." *Commonwealth v. Briggs*, 12 A.3d 291, 314 (Pa. 2011). However, even

where prejudice is presumed, a change of venue or venire is not warranted unless the defendant also shows that the pre-trial publicity was so extensive, sustained, and pervasive that the community must be deemed to have been saturated with it, and that there was insufficient time between the publicity and the trial for any prejudice to have dissipated. *Id*. at 314-15.

In 2018, after summarizing the news coverage of this case beginning in 2009, the trial court found that Appellant's pretrial publicity claims were "overstated" and a change of venue or venire was "unwarranted." Trial Court Opinion, 4/11/18, at 24. Revisiting this issue in its 2022 Rule 1925(a) opinion, the trial court provided a detailed summary of the content of the news articles regarding the Easton Café homicide that had occurred pre-trial and again detailed its reasoning for denying the motion as follows:

> While [a] summary of local media reports highlights the most inflammatory portions, much of the reporting on this case has been factual and objective in nature. Our review found no media reports that disclosed [Appellant's] prior criminal record. No media reports referenced a confession or admission attributed to [Appellant]. Numerous articles, however, noted Barndt's guilty plea and his grand jury testimony implicating [Appellant]. Additionally, several articles referred to [Appellant's] appearance before the investigating grand jury and [Appellant's] invocation of his Fifth Amendment rights.
>
> The Northampton County District Attorney's Office held a press conference on August 16, 2017 to announce [Appellant's] arrest. Local media covered this announcement and other related hearings, later quoting various members of the District Attorney's Office commenting on the matter. While some of these statements appear to impugn [Appellant's] character, we do not find that they were overly prejudicial. Separately, media reports regarding [Appellant's] lack of cooperation with the investigating grand jury appear to stem from a grand jury report that was

released following Barndt's arrest in 2014. These reports are a matter of public record, and as such, we cannot rule that public dissemination of such information violates the [**Commonwealth v. **]**Pierce**[, 303 A.2d 209 (Pa. 1973)] standard. This information is not a "statement" from the District Attorney's Office.

Many articles referenced [Appellant's] familial relationship to former world heavyweight boxing champion, Larry Holmes. Generally, a defendant's reputation in the community is not considered in evaluating pretrial prejudice. The Supreme Court of Pennsylvania has refused to "accept the position that prominence brings prejudice." In [**Commonwealth v. **]**Casper**, [392 A.2d 287 (Pa. 1978)] the court concluded that the "public figure" element was "entirely too amorphous and subject to speculation to be added as a basis for pretrial presumption of prejudice in any but the most truly extraordinary cases." [Appellant's] trial is not a "truly extraordinary" case warranting heightened consideration of his status as a "public figure." His familial relationship to a former heavyweight boxing champion simply does not rise to that level.

Having reviewed the media coverage to this point, we did not conclude that "there is a substantial likelihood that a fair trial cannot be had" in Northampton County. As a result[,] this [c]ourt did not err in denying [Appellant's] motion for change of venue/venire.

**See** Trial Court Opinion, 2/2/22, at 57-58 (citations omitted).

We discern no abuse of discretion in the trial court's reasoning. Appellant has not pointed to any actual prejudice that he suffered during jury selection, and we uncovered none through our review of the record. Only seventeen of the one hundred and fifty-four prospective jurors indicated that they were aware of Appellant's case prior to arriving at court. **See** N.T. Jury Trial Vol I, 11/30/20, at 47, 143; N.T. Jury Trial Vol II, 12/1/20, at 19; N.T. Jury Trial Vol VI, 12/7/20, at 223-24. Of those prospective jurors, only one served on the jury, as an alternate, and only after she indicated that she could

set aside the limited information she had gleaned by skimming an article about the case and be fair and impartial. ***See*** N.T. Jury Trial Vol VI, 12/7/20, at 223-24.

Furthermore, even if prejudice were presumed, no relief would be due because of the remoteness of the publications Appellant cites as problematic. The most recent article Appellant provided was published in 2017, three years before his trial took place. We have found far shorter cooling-off periods to be sufficient to ensure that the selected jurors would be able to consider the case fairly and impartially. ***See Walter***, ***supra*** at 281 (finding that the passage of eleven months between the last inflammatory newspaper article and the start of trial was sufficient to dispel any prejudice against the defendant). Therefore, we hold that the trial court did not abuse its discretion in denying Appellant's motion for change of venue or venire.

As we have determined that neither of Appellant's issues merits relief, we have no cause to disturb his judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/25/2023